**Prudencio T. FELICIANO et al.,
Plaintiffs,**

**v.**

**George ROMNEY, Secretary of the Department of Housing and Urban Development, et al., Defendants.**

**No. 71 Civ. 1575.**

United States District Court,
S. D. New York.

May 5, 1971.

Cora T. Walker, New York City (Harold L. Young, New York City, of counsel), for plaintiffs.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y. (Dennis J. Helms, New York City, of counsel), for George Romney, S. William Green.

Louis J. Lefkowitz, Atty. Gen., State of N. Y. (Murray Sylvester, Asst. Atty. Gen., of counsel), J. Lee Rankin, Corp. Counsel, City of New York (John E. Thompson, Spec. Asst. Corp. Counsel, Michael B. Ryan, New York City, of counsel), for other defendants.

## MEMORANDUM

TENNEY, District Judge.

By order to show cause dated April 15, 1971, plaintiffs, residents of site 23 of the Milbank-Frawley Circle Urban Renewal area (hereinafter referred to as the "renewal area"), move pursuant to Fed.R.Civ.P. 65 for a preliminary injunction, pending final determination of the instant suit.

The relief sought, which is extraordinarily pervasive in both scope and terms, may fairly be summarized as follows: First, movants seek to require the defendants to submit to this Court a workable plan for—(a) promptly relocating poor Black and Puerto Rican residents of the renewal area into adequate housing without curtailing the available supply of such housing for other low and moderate income families in the City; (b) replacing within one year after removal each unit of low income housing removed from the housing market by redevelopment; and (c) rehabilitating and maintaining existing occupied housing units in the renewal area at standards in accordance with local and federal housing requirements. Second, plaintiffs would have the defendants preliminarily enjoined from: (a) displacing them in any manner other than by placing them into decent housing as required by law, and only until such time as local structurally sound existing structures have been rehabilitated; (b) acquiring title to any residential property in the renewal area requiring maintenance of buildings or relocation of residents; (c) relocating plaintiffs from city-owned housing into other dwellings for the purpose of constructing new housing, until existing structurally sound and vacant buildings have been rehabilitated, pursuant to an urban renewal plan previously approved by the New York City Board of Estimate in November of 1968; (d) relocating residents of the renewal area in a manner other than in compliance with the approved community development plan, providing for community owned and operated low and middle income housing at rents that residents will be able to afford; (e) curtailing any services in housing presently owned by the City and occupied by residents of the renewal area; (f) failing or refusing to renew a contract with the Milbank-Frawley Circle Housing Council (hereinafter referred to as the "Council"), an organization representing community residents affected by the renewal project, which expires on May 31, 1971; (g) withholding processing and payment of vouchers to the Council when due; (h) withholding furniture and equipment from the Council, for which funds had already been federally provided; and (i) interfering with the Council in its performance of its legal responsibilities and duties to the plaintiffs and residents of the renewal area.

Finally, movants seek an order requiring defendants to: (a) maintain all occupied housing in the renewal area in accordance with local and federal housing standards; (b) rehabilitate within one year approved structurally sound low income replacement housing in the renewal area in a number equal to the low income housing withdrawn from the market by the renewal project; and (c) comply with the federal laws requiring that an opportunity in accordance with

an affirmative plan be provided for training and employing residents of the renewal area for construction work.

In the event that a workable relocation plan as set forth above is not provided by defendants by a date certain, it is further prayed that the federal defendants be enjoined from honoring requisitions by City and State defendants, or that the City of New York be enjoined from financing renewal activities in the area, and that the City be further prohibited from acquiring and demolishing property and displacing residents in the renewal area.

More simply stated, movants seek: first, to enjoin all further attempts with respect to acquisition, site clearance and relocation efforts in the renewal area until a definitive plan for relocation and rehabilitation acceptable to them is produced; second, to mandamus the City and State defendants into performing certain maintenance and rehabilitation functions, and to require the Federal Government to renew its contract with the Council; and, finally, to prevent the Federal Government from honoring certain unspecified requisitions from the City and State defendants.

Thus, movants' preliminary prayer, which it will be noted is essentially identical to the relief ultimately sought herein, urges that a federal court oversee, administer, directly control and, in part, referee a contest among antagonistic groups concerning the erection of long-overdue and urgently needed, decent living facilities for low and middle income Black and Puerto Rican people in the City.

By way of background, and in order that the conclusion reached herein be understood in its proper and limited perspective, the following facts should also be set forth.

The plaintiffs herein are poor to moderate income Black and Puerto Rican individuals who are fearful of eviction from their residences in the renewal area because of a pending state court eviction proceeding. The individual defendants are federal, state and local heads of governments, agencies and corporations involved in the instant redevelopment project. The interrelationship among these defendants briefly is as follows:

The federal defendants are authorized to administer the provisions of the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. § 3301 et seq., and the Housing Act of 1949, as amended, 42 U.S.C. § 1441 et seq., which includes approving, supervising and financing Model Cities Urban Renewal Projects.

The State defendants essentially are those parties responsible for administering the New York Urban Development Corporation (hereinafter referred to as "NYUDC"), which is the State agency primarily involved in developing the renewal area.

The four City defendants are empowered to receive federal funding for local Model Cities and urban renewal programs, and to administer, direct and supervise such programs in the City.

Finally, defendant Clark is the chairman of the 110th Street Plaza Housing Development Corporation, which has been designated as developer of the proposed housing project to be located on site 23 within the renewal area.

Apparently two events precipitated the instant action and motion brought pursuant thereto: first, the abandonment by the City defendants of a previously agreed to "workable relocation plan" which provided, *inter alia* for rehabilitating structurally sound buildings located on site 23 of the renewal area for the housing of displaced tenants, and, second, a pending State court eviction proceeding brought on by the City in order to clear site 23 for construction.

The relocation plan which had been approved by the City and federal defendant Department of Housing and Urban Development (hereinafter referred to as "HUD") further provided for the training and use of neighborhood personnel in the operation and construction of the project. Plaintiffs allege that as a re-

sult of the abandonment of this plan, they and those whom they seek to represent will be forced into undesirable, indecent and more expensive housing. It is further alleged that the City has threatened to break up large families in order to relocate them, and has already moved some families into welfare hotels and other sub-standard deplorable housing. Plaintiffs also complain that some of those whom they seek to represent have been moved into public housing projects which, in view of the large demand for space therein, has decreased the supply of existing housing for poor people. In addition, the City is charged with deliberately failing to follow the previously approved plan, and discriminating against the plaintiffs who presently live in housing owned by the City, by providing unsatisfactory municipal services. Finally, it is urged that substitute housing is unavailable to the plaintiffs in other areas of the City due to city-wide practices of racial discrimination.

As indicated *supra*, the second motivating and perhaps more immediate force behind the instant application is a presently pending eviction proceeding against plaintiffs and others, commenced by the City in the New York State Supreme Court. On April 15, 1971, the City agreed to stay said proceedings until the issue now before the Court is determined. However, by letter dated April 29, 1971, the Court has been informed that the eviction proceedings have been rescheduled for May 6, 1971.

In urging that the requested relief be granted, movants essentially contend that the following statutes and constitutional amendments have been violated:

(1) Section 105(c) of the Housing Act of 1949, 42 U.S.C. § 1455(c) (1), (2) which, in substance, provides standards for the temporary relocation of persons, families and businesses. These standards mandate that those displaced be provided with decent, safe, sanitary facilities which are generally not less desirable than those from which tenants are evicted. The Secretary of HUD is empowered to issue such rules and regulations as are necessary to effectuate the program. Moreover, as a condition to receiving federal assistance when displacement of persons is required, subsection (c) (2) of the statute requires that the Secretary be assured by the local agency within a reasonable time prior to displacement that decent, safe and sanitary dwellings are available for those who must be relocated.

(2) Section 106(h) of the same Act, 42 U.S.C. § 1456(h), which essentially provides that the Federal Government shall not contract to loan or grant funds under the Act unless it is assured by the local public agency empowered to receive such funds that the project will be carried out in accordance with an approved urban renewal plan which comports with the requirements of Section 105(a) of the Act.

(3) Sections 101, 103 and 107 of the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. §§ 3301, 3303 and 3307, which, collectively, announce the Congressional purpose for enacting the Act, set forth the requirements for the receipt of federal assistance by cities, stress a desire for local initiative in planning, development and implementing the program and finally require a plan for the relocation of those persons displaced or to be displaced in effectuating the program. Section 107 of the Act additionally requires that the relocation plan meet those standards set forth in Section 105(c) of the Housing Act of 1949, and that the relocation activities be consistent, to the extent feasible, with increasing or maintaining the supply of acceptable housing for families and individuals of low and moderate income.

(4) The Civil Rights Act of 1871, 42 U.S.C. § 1983, which permits an action to be brought against a person acting under color of state or federal law who deprives another of his constitutional or statutory rights.

(5) The Fifth and Fourteenth amendments of the United States Constitution.

Movants thus complain that by abandoning the previously agreed-to plan for relocation, and instituting an eviction proceeding in the State court, the concept and intent of the federal statutes are being violated because: (a) construction is not proceeding in stages as agreed upon; (b) families and individuals are being dispossessed without being offered satisfactory relocation facilities; (c) structurally sound facilities are not being rehabilitated for occupancy by those displaced; (d) job and job training are not being offered the residents of the renewal area; (e) satisfactory municipal services are not being provided the people in the project area; and (f) the plans for the new facilities have been so revised as to make their rental prices too expensive for plaintiffs and the members of the class they seek to represent.

In opposition to the motion, the federal defendants primarily urge that movants' action is premature because no firm financial commitment has been made by HUD to support the renewal project. The City's relationship to HUD to date is governed solely by a letter of consent dated July 18, 1969,[1] as supplemented by an amended letter of consent dated March 17, 1971.[2] While a letter of consent will be issued only upon an applicant's showing of both the need to undertake the proposed activities during a project's planning stages, and that the activities will be consistent with the urban renewal plan being developed, the activities are nevertheless performed prior to the effective date of any subsequently executed contract for loan and grant. Even though said letter may include provisions for acquisition of land, site clearance and relocation of occupants, it does not constitute a firm commitment on behalf of the Federal Government to compensate the City for expenditures on such activities.[3] It should further be

noted that letters of consent do not commit the Federal Government to provide funds for carrying out and completing the project.[4] Indeed, the eligibility of "letter of consent activities" for ultimate inclusion in the gross cost of the project is determined after the contract for loan and grant is executed and depends upon the City's compliance with relevant federal statutes, rules and regulations.[5] Movants do not dispute that New York City's application for a contract for loan and grant, with regard to the disputed project site, is still pending before HUD. In regard to this, I shall have more to say later herein. It further appears that prior to approval of application, HUD must be satisfied that the City's activities pursuant to the letter of consent comport with HUD's regulations, and that the City's relocation plan, submitted with its application for a contract for loan and grant, similarly conforms to specified federal requirements.[6]

In view of the foregoing, it is the Federal Government's position that since HUD has taken no final administrative action with respect to the allegedly deficient relocation plans, there is nothing for this Court to review. It is further urged with respect to movants' attempt to mandamus the Government into contracting with the Council that: (a) since no action has yet been taken with regard thereto, this is also premature for review, and (b) in any event the Government is under no obligation to contract with the Council.

That the plan which may be approved by HUD may be violative of federal statutory or regulatory requirements is obviously too speculative a basis upon which presently to issue an injunction. Moreover, mere approval by the Federal Government of guidelines set forth in a relocation plan, submitted prior to the issuance of the letter of consent, pro-

---

1. Exh. A, annexed to Affid. of Steven Love (dated April 27, 1971).

2. Exh. B, annexed to Affid. of Steven Love (dated April 27, 1971).

3. Exh. A, at 2, ¶ 1, annexed to Affid. of Steven Love (dated April 27, 1971).

4. *Id.* at 2, ¶ 2.

5. *Id.* at 2, ¶¶ 3 and 4.

6. Affid. of Steven Love at ¶ 10 (dated April 27, 1971).

vides no basis for injunctive relief herein, since the Government is not yet committed, either to the renewal project or to reimburse the City, for the "letter of consent" expenditures made to date. From the foregoing it would seem that an injunction could only properly issue against the federal defendants upon a showing that funds have been committed to the City pursuant to an existing contract for loan and grant, and that the relocation plans submitted and/or "letter of consent activities" violated applicable federal statutes or regulations.

The City's and State's position in this action is necessarily more sensitive, inasmuch as they are directly involved in, and responsible for, the pending eviction proceedings plaintiffs seek to enjoin. The State persuasively argues that a delay in construction past June 1, 1971 (the date on which the builder's commitment is no longer binding) would likely result in an abortion of the entire project. At a time when the critical housing shortage in this City is all too apparent, a Court must carefully consider whether it will chance responsibility for preventing the construction of six hundred new housing units for low and middle income families which are scheduled to replace one hundred and fifty slum dwellings. The State represents that NYUDC presently has the funds and permits necessary to commence construction immediately, and has a commitment from a builder who is prepared to commence work at any time before June 1, 1971. Although the City has, pursuant to its agreement with the State, acquired title to the project property, the only remaining obstacle to construction is the relocation of the remaining occupants on site 23. The City has advised the Court that only the westerly portion of site 23, where there are only 18 remaining occupants, is immediately needed for construction, and that although it originally sought eviction against all occupants of site 23, it will presently seek removal only of those occupants residing on the westerly portion of the site. Moreover, City defendant

Walsh, Administrator of the New York City Housing Development Administration, indicates that adequate provisions have been made for the relocation of these families into safe, standard, freshly painted temporary relocation facilities in the renewal area at rentals substantially similar to those presently being paid. Other families, if they so choose, will allegedly be permitted to move into New York City Housing Authority units in a project of their choice. In fact, Mr. Walsh asserts with regard to occupants of both the easterly and westerly portions of site 23, that no tenant will be evicted for site clearance purposes unless safe standard housing is available which is in accordance with the plan presently pending approval of HUD. The City has further furnished the Court with some evidence [7] that suitable accommodations will be available for the tenants when possession is required of both the westerly and easterly portions of site 23.

Since movants request preliminary relief, essentially identical to that ultimately sought, the burden of proof upon them is necessarily greater than that which would be required in the absence of such request. Hambros Bank, Ltd. v. Meserole, 287 F.Supp. 69, 71 (S.D. N.Y.1968). The weight of this burden is further increased, since the injunction if issued will adversely affect a public interest. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Snively Groves Inc. v. Florida Citrus Comm., 23 F.Supp. 600, 604 (N.D. Fla.1938). Without even considering the likelihood of success by the plaintiffs herein, it seems plain that they have not shouldered the heavy burden the law has cast upon them.

As another Judge of this court has recently noted in determining whether a preliminary injunction should issue, "[a]mong the more important factors to be considered are the relative importance of the rights asserted and the acts to be enjoined, the harm that would

---

7. Exh. B, annexed to Affid. of Albert A. Walsh (dated April 27, 1971).

result during the pendency of the action from granting or refusing to grant a preliminary injunction, the chances of success the movant has on the merits, and the public interest. . . ." (Citations omitted.) Tennant & Sons, Inc. v. New York Terminal Conference, 299 F. Supp. 796, 798 (S.D.N.Y.1969). Since the City represents that the tenants of site 23 will be relocated into satisfactory temporary facilities in accordance with federal and local requirements, it would appear unwise to presently enjoin, with the possibility of aborting, the commencement of construction of 600 desperately needed apartments for poor and middle income residents of this City. Indeed, under the facts presently existing, it seems likely that more irreparable harm would be caused to those unrepresented poor and middle income New Yorkers who would inhabit the new dwellings, than to the plaintiffs and those whom they seek to represent. Save for the tenants who face imminent dispossession, it does not appear, nor is there any evidence, that the purported class will presently suffer any irreparable injury.

I do not read Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968), rev'g 42 F.R.D. 617 (D.Conn.1967) and Arrington v. City of Fairfield, Alabama, 414 F.2d 687 (5th Cir. 1969) as authority for the issuance of a preliminary injunction herein. In both of those cases, and in Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968), another case bearing upon similar issues, HUD had already committed itself to funding the local renewal project. In those cases a real as opposed to speculative violation of 42 U.S.C. § 1455(c) was pleaded and considered. In the instant case, since no binding commitment has been made by HUD, a violation cannot yet have occurred. If, after the Federal Government commits itself, it is urged that the local renewal plan approved by HUD is violative of the statute or is not being implemented in accordance with its provisions, then a different and perhaps more cognizable injury would be before the Court.

It should be noted, however, that since Section 105(c) (2) of the Housing Act of 1949, 42 U.S.C. § 1455(c) (2), specifically provides that:

"As a condition to further assistance . . . with respect to each urban renewal project involving the displacement of individuals and families, the Secretary shall require, within a reasonable time prior to actual displacement, satisfactory assurance by the local public agency that decent, safe, and sanitary dwellings . . . are available for the relocation of each such individual or family."

it would seem that the equities in favor of granting a preliminary injunction increase as the number of tenants facing eviction prior to approval of the plan increases. Otherwise, large numbers of tenants would face irreparable injury in the event that the Government belabored consideration of a plan which was ultimately found to be violative of Section 105(c) (1) of the Housing Act of 1949. Thus, while relocation may be commenced on the basis of assurances to HUD that acceptable substitute housing is available, it may subsequently become subject to injunction as the number of evictions increase, in the absence of the Federal Government's approval of a relocation plan.

Further, although the Court of Appeals in *Norwalk CORE*, 395 F.2d at 929, held that the complaint, which alleged a pattern of relocation discriminating against Negroes and Puerto Ricans, should not have been dismissed, since substantial constitutional violations were alleged, it neither ruled nor intimated that prior to a relocation plan's federal approval, and a binding commitment from HUD, a preliminary injunction enjoining a state court eviction proceeding should issue. Nor did it hold that a federal district court had authority to require a local municipality to revive a previously abandoned agreement with an organization representing the tenants of the renewal area. With regard to the

remedies that might be available to the *Norwalk* plaintiffs, the Court noted "[a]s a general matter, the most appropriate form of judicial relief in cases such as this would be to require proof that the relocation standard is being met. . . . An affirmative form of relief, such as an order requiring the construction of low-income housing, would of course be much less appropriate, since it would necessarily involve the court in areas foreign to its experience and competence." Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 929–930 (2d Cir. 1968).

In view of the fact that no "plan" has yet been approved and movants seek such encompassing federal intervention in an area foreign to this Court's experience and competence, it would appear that plaintiffs' motion is premature and the relief requested unwarranted. With regard to movants' contention that they have no appropriate state court remedy at the pending eviction proceedings, the authorities submitted on this point, Kaskel v. Impellitteri, 306 N.Y. 73, 115 N.E. 2d 659 (1953); Hunter v. City of New York, 121 N.Y.S.2d 841 (Sup.Ct.1953); Patchogue Homes Corp. v. Brown, 195 N.Y.S.2d 979 (Sup.Ct.1959), do not support his view, and N.Y. Real Prop. Law § 743 (McKinney 1970) would appear to rebut it.

I therefore conclude that since movants do not seek to permanently remain in their present apartments, but, rather, desire that renewal proceed in accordance with a plan suitable to them, and since an injunction of state proceedings is sought primarily on the basis of anticipated future, as opposed to presently existing violations, that an injunction should not issue. Certainly it cannot be seriously urged that the plan abandoned by the City is the only one that would comport with federal requirements. Nor can it earnestly be argued that on the basis of the papers before me the City's abandonment of the plan is federally redressable or a proper basis for the requested injunctive relief. Thus I find no basis for enjoining the State proceeding merely because the City has refused to comply with a prior agreement to rehabilitate existing structurally sound buildings in the renewal area; no statute or regulation requires that this be done.

I am further constrained to deny movants' request for a hearing on this motion since nothing that they seek to adduce will affect the conclusions reached herein. Even were we to assume that the relocation plan abandoned by the City was in the best interests of the community, and all others concerned, it is not this Court's function to pre-judge relocation and renewal plans pending approval before the Secretary of HUD. Moreover, even if it be conceded that the City defendants do not have the apartments that they claim are available to the occupants of the westerly portion of site 23, this is a matter for the judge presiding at the pending eviction proceedings wherein perhaps a hearing should be held. If it appears that evictions increase substantially, prior to HUD's approval of a relocation plan, then, doubtless a hearing will be required in order to prevent irreparable injury to those residents facing eviction. By this I do not suggest that the plight of the eighteen occupants facing imminent eviction is of little consequence; rather, the Court presently considers more substantial the irreparable injury that could result to the potential occupants of 600 apartments scheduled for construction, if the project is aborted.

Insofar as any requested injunctive and affirmative relief has not been specifically covered herein, since no other authority has been presented, nor independently discovered by the Court, warranting such federal judicial encroachment upon state and local administrative activities at this time, these requests must also be denied.

Accordingly, and for the foregoing reasons, plaintiffs' motion for a preliminary injunction and for affirmative relief is in all respects denied.

So ordered.