COALITION FOR UNITED COMMUNITY ACTION, an unincorporated association of community organizations, et al.,

v.

George M. ROMNEY, Secretary, United States Department of Housing and Urban Development.

No. 69 C 1626.

United States District Court,
N. D. Illinois, E. D.

April 6, 1970.

Cecil Butler, Kenneth K. Howell and Stanley A. Bass, Community Legal Counsel, Chicago, Ill., for plaintiffs.

Thomas A. Foran, U. S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM

AUSTIN, District Judge.

Congress enacted the Demonstration Cities and Metropolitan Development Program statute in November 1966, commonly referred to as the Model Cities Act. 42 U.S.C. Ch. 41, § 3301 et seq. In its prologue section to the operative provisions of the Act, Congress declared:

" * * * that improving the quality of urban life is the most critical domestic problem facing the United States. The persistence of widespread urban slums and blight, the concentration of persons of low income in older urban areas, and the unmet needs for additional housing and community facilities and services arising from rapid expansion of our urban population have resulted in a marked deterioration in the quality of the environment and lives of large numbers of our people while the Nation as a whole prospers. * * * " Subch. 1, § 3301.

Its purpose was

" * * * to provide additional financial and technical assistance to enable cities of all sizes (with equal regard to the problems of small as well as large cities) to plan, develop and carry out locally prepared and scheduled comprehensive city demonstration programs containing new and imaginative proposals to rebuild or revitalize large slum and blighted areas; to expand housing, job and income opportunities; to reduce dependence on welfare payments; to improve educational facilities and programs; to reduce the incidence of crime and delinquency; to enhance recreational and cultural opportunities; to establish better access between home and jobs; and generally to improve living conditions for the people who live in such areas, and to accomplish these objectives through the most effective and economical concentration and coordination of Federal, State, and local public and private efforts to improve the quality of urban life. * * * " § 3301.

Pursuant to this proffer of assistance, the City of Chicago, under a contract dated July 1, 1968, received a total grant of $201,000 of federal funds for the purpose of planning and developing a comprehensive city demonstration program as provided under § 3304 of the Act.[1]

On April 21, 1969, after a study of the Chicago proposal, the Federal Regional Coordinating Committee (composed of those agencies concerned in the operation of the Model Cities Act) criticized certain phases of the proposal and made recommendations for correction of certain phases of the Chicago plan before it could be finally approved. Such revisions were made by the city and on June 26, 1969 the defendant Secretary approved the Chicago Model Cities Program and authorized an assistance grant of $38,000,000 for the First Year Action Program under the Plan. The full program was to have a five year term.

Following the approval of June 26, 1969, the City of Chicago, on August 1, 1969, accepted the contract offered by the Department of Housing and Urban Development and is presently operating thereunder.

The thrust of the instant suit is to rectify the alleged failure of the defendant Secretary to perform his duty under § 3305 to determine, before his approval is given, that such Plan did "satisfy the criteria for such programs set forth in § 3303." It is alleged that the Chicago Model Cities Program received his approval although (1) it was prepared and submitted by the City without "widespread citizen participation" in its planning, and fails, as approved, to provide for such participation in violation of § 3303; (2) it failed to contain the statutory prerequisite of a relocation plan required by § 3303(4) and § 3307; (3) it did not contain "data as current and

complete as necessary to make valid program determination" as required by CDA Letter No. 1, October 30, 1967, p. 4, 2.2 in that it was based on a 1960 census which overlooked 150,000 black residents and because the areas involved were inherently subject to rapid physical, social and economic changes.

The court is asked to enjoin the defendant Secretary "from continuing to approve and provide funds to the City of Chicago in its capacity as City Demonstration Agency for the purpose of carrying out any program funded" by the Act until such time as the City has satisfied the statutory conditions. Jurisdiction to provide such relief is sought under the Declaratory Judgment Act, 28 U.S.C. § 2201; under the Administrative Procedure Act, 5 U.S.C. §§ 702, 703, 704 for review of the Secretary's approval because it was given arbitrarily, capriciously, in abuse of his statutory authority, and without regard to the statutory limitations imposed on his authority; under 28 U.S.C. § 1331 as an action arising under the laws of the United States, i.e. the Model Cities Act and its regulations, wherein the amount in controversy exceeds $10,000; and additionally under 28 U.S.C. § 1361 as being an action in the nature of mandamus to compel the defendant Secretary to perform the statutory duty owed to the plaintiffs.

Defendant's motion to dismiss the complaint asserts (1) the court lacks jurisdiction of the subject matter and the person of the defendant because the suit is against the sovereign; there has been no waiver of sovereign immunity and no statutory consent exists permitting this suit; (2) there is a failure to state a claim upon which relief can be granted in that discretionary acts of officers of the United States are not subject to review; (3) there is a failure to join an indispensable party to this

---

1. The program presented for federal approval covered an area of over six square miles with a population of approximately 811,610 and was divided into four geographical regions of the city—West (Lawndale); Near South (Grand Boulevard); Mid-South (Woodlawn); North (Uptown). Certain target areas with a total population of about 257,000 within these environs were destined for primary intensive study and programming.

action—the City of Chicago; and in the event joinder is made, the venue of this action is improper under 28 U.S.C. § 1391(e); and (4) the plaintiffs have no standing to bring this suit.

■■ There are two recognized exceptions to the sovereign immunity doctrine. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1969); City of Fresno v. California, 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1969); Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Larson v. Domestic & Foreign Comm. Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The exceptions are applicable where the suit involves (1) actions by officers beyond their statutory powers, and (2) even though within the scope of authority, the powers themselves or the manner in which they are exercised are constitutionally void. *Larson, supra,* p. 702, 69 S.Ct. 1457. As alleged, this suit is within the first exception, because of the failure of the defendant to determine that statutory criteria exist in the plan before he can exercise his discretion to approve § 3305. It is not merely alleged that the Secretary's action was erroneous, or that he was mistaken as to fact or law; it is that he acted arbitrarily and capriciously beyond his statutory authority. In such circumstances, action for specific relief against the officer as an individual has been recognized. The court concludes that this is not a suit against the sovereign within the proscription of the doctrine of sovereign immunity. It is within a recognized exception to that rule.

■■ There being no sovereign immunity, jurisdiction under the Administrative Procedure Act exists although that Act itself does not constitute a consent of the United States to all suits of whatever nature and is not a blanket waiver of sovereign immunity. It is applicable except where (1) statutes preclude judicial review, or (2) where agency action is committed to agency discretion by law. 5 U.S.C. § 701. The Supreme Court of the United States has very recently iterated the approach to the review provisions of the Act. In Data Processing Service v. Camp, March 3, 1970, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184, it said:

> "There is no presumption against judicial review and in favor of administrative absolutism (see Abbott Laboratories v. Gardner, 387 U.S. 136, 140, [87 S.Ct. 1507, 18 L.Ed.2d 681]) unless that purpose is fairly discernible in the statutory scheme." 90 S.Ct. at p. 831.

The Model Cities Act contains no provision precluding review and the court can find no inhibiting implications in its statutory scheme. It is only upon a showing of "clear and convincing evidence" of contrary legislative intent that the courts should restrict access to judicial review. Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681.

■ In addition, because sovereign immunity does not bar this action, the court has jurisdiction under the federal question and mandamus statutes. 28 U.S.C. §§ 1331, 1361.

■■ The court also determines that the venue requirements of § 1391(e) are satisfied. The City of Chicago is not an indispensable party to the action because the relief sought is only against the Secretary of HUD. While the City may perhaps be a desirable party it is not indispensable. Powelton Civic Home Owners Ass'n v. Dept. of H.U.D., 284 F. Supp. 809, 814 (D.C.Pa., 1968). Should joinder appear feasible, however, this court is in agreement with decisions which hold that such joinder would not make venue improper. Brotherhood Locomotive Engrs. v. Denver & R.G.W., 290 F.Supp. 612, 615, (D.C.Colo.1968) citing *Powelton, supra;* Kletschka v. Driver, 411 F.2d 436, 442 (C.A.2, 1969), also citing *Powelton, supra;* and unpublished opinion of my learned colleague Judge Hoffman in Inmates of Cook County v. Tierney, 68 C 504.

The last challenge to the action involves the right of these plaintiffs to

bring this action. The plaintiffs are four organizations, their presiding officers, and fifteen individuals who bring the suit as a class. All organization plaintiffs allege that they were founded by, composed of and represent residents in the affected Model Cities areas; the individuals are residents of these areas and bring the suit on behalf of all residents thereof.

The court's jurisdiction under the Declaratory Judgment Act is dependent upon whether the facts alleged under all the circumstances show there is a substantial controversy between the parties having adverse legal interests of sufficient immediacy and reality to warrant court interference. As indicated earlier, although the Administrative Procedure Act seems to confer standing on anyone who is "adversely affected" by agency action, that Act does not confer standing which does not exist apart from that provision.

Defendant contends that plaintiffs are not a party to the federal contract, are not a recipient of a federal grant, have no vested interest under the Act, and stand in no better position than any other member of the public insofar as acts of the defendant are concerned and further allege no violation of constitutional civil rights.

It is clear that no explicit statutory provision is necessary to confer standing. Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). It is also clear that standing

" * * * concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question. * * * " Data Processing v. Camp, supra, 90 S.Ct. at p. 830.

Standing, as described in Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), is one of "the most amorphous (concepts) in the entire domain of public law." The most frequent-

ly applied tests were tangible—i.e. property, contract, rights protected against tortious invasion, or rights founded on a statute which confers a privilege; the concept however covers "aesthetic, conservational and recreational as well as economic values" and

"where statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action. The whole drive for enlarging the category of aggrieved 'persons' is symptomatic of that trend. * * * " Data Processing v. Camp, supra, 90 S.Ct. at p. 830.

The litigants are concerned with the decisions of the Seventh Circuit Court of Appeals in Harrison-Halsted Community Group, Inc. v. HHFA, 310 F.2d 99 (7 Cir. 1962); Green Street Assn. v. Daley, 373 F.2d 1 (7 Cir. 1967); and South Suburban Safeway Lines v. Chicago, 416 F.2d 535 (7 Cir. 1969), and their reconciliation, with the Supreme Court decisions of Abbott Laboratories v. Gardner, supra; Flast v. Cohen, supra, and the most recent Supreme Court expressions in Data Processing v. Camp, supra, and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192.

A clear analysis of the position of the Seventh Circuit and its adherence to the rule on standing as applied in Harrison-Halsted and Green Street is contained in Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, 395 F.2d 920, 927 et seq. (1968). Both were brought to enjoin federal and local officials from disbursement of federal funds for public uses the nature of which were determined by local officials. The Seventh Circuit declared that where eminent domain has been exercised and thereby public use determined, the question of what public use was to be made of condemned land was foreclosed from attack. Both cases have been frequently cited to other courts as supporting a defeat of standing and have either been distinguished factually and where not distinguished have been rejected. Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, supra, p. 935; Powelton v. Department of H.U.D., su-

748

*pra*, 284 F.Supp. pp. 823–825. In *South Suburban* the Court of Appeals applied the accepted rule that no one has a right to be free from competition absent a statutory protection.

 It is clear that neither economic injury nor specific individual legal rights are necessary to the issue of standing. Scenic Hudson Preservation Conference v. F. P. C., 354 F.2d 608 (C.A.2, 1965); Data Processing v. Camp, *supra*, 90 S.Ct. p. 832.

In resolving the plaintiffs' position, the court must determine *First*, whether they have the personal stake and interest that impart the concrete adverseness required by Article III, U.S.Const.; and *Second*, whether the interest sought to be protected is arguably within the zone of interests to be protected or regulated by the statute. Barlow v. Collins, *supra*.

 The statutory scheme of the Model Cities Act is premised on the citizen's involvement in all phases of the comprehensive program. It assures that no plan will be formulated and no action thereunder commenced except as there is "widespread citizen participation". It sought by this phrase to have the area resident not only advised and aware of the steps being taken to improve the quality of his urban area, but also gave him the opportunity to voice his views and to be involved in the plans for his neighborhood. HUD itself in its Policy Statement on such participation stated that "improving the quality of life of the residents of the model neighborhood can be accomplished only by the affirmative actions of the people themselves." CDA Letter 3, 11/30/1967, Stip. Ex. 2. Congress recognized that area residents have that personal stake which demands involvement in any Plan whose objectives are to benefit him and the city through the Model Cities goals for better hous-

ing, employment, education, health, police protection, etc. and that the Model Cities Act was not merely to create sterile improvements of physical conditions of the neighborhood.

 The only effective means which plaintiffs have to assure citizen participation is to challenge the efficacy of the plan which, as they allege, excluded them. They are within the zone of interests protected by the Model Cities Act, and as residents of the area are within the class of persons which the statutory provision was designed to protect.

The defendant's motion to dismiss is denied and an order in accord therewith has this day been entered. The court implies no determination by the ruling on this motion that plaintiff organizations come within the performance standards of CDA Letter No. 3, as being the recognized conduit for citizens participation before the plan was approved.

*Plaintiffs' Motion for Preliminary Injunction and Partial Summary Judgment.*

These motions are directed to the statutory provision providing that a comprehensive city demonstration program is eligible for funding "only if * * * there exists a relocation plan meeting the requirements of the regulations referred to in § 3307." Section 3303(a) (4). Section 3307 of the Act requires that a plan for the relocation of persons displaced by the program be submitted consistent with regulations prescribed by the Secretary.[2]

It is admitted that the Chicago program did not at the time of submission contain a full relocation plan which would meet the procedural and substantive requirements contained in CDA Letter No. 5 published November 1968. (Motion to Dism., Ex. 4). Because that letter was published and distributed

2. "§ 3307. * * * The relocation plan shall be consistent with regulations prescribed by the Secretary to assure that (1) the provisions and procedures included in the plan meet relocation stand- ards equivalent to those prescribed under section 105(c) of the Housing Act of 1949 [§ 1465(c), 42 USC] with respect to urban renewal projects assisted under Title I of that Act, * * *"

much later than expected and because HUD felt that the programs of the early cities would be unable to comply with its standards, interim procedures and requirements on relocation plans were developed and distributed so that the early cities would suffer no delay in funding because of the deficiency.

Plaintiffs contend that said interim relocation plan for the Model Cities Area does not conform to the minimum standards set by HUD for such plans. The interim plans were required to contain (1) acknowledgement and adoption of the basic policies and requirements of paragraphs 2 and 4 of CDA Letter No. 5 (Motion to Dism., Ex. 4); (2) estimates of displacement workload not otherwise provided for; (3) description of approach to meet requirement that housing constructed must replace housing displaced; (4) description of time period required for preparation and submission of full relocation plan. (Motion to Dism., Ex. 7). To insure that no displacement would occur under the interim relocation plans, HUD required that every Grant Agreement to a city contain the following provision:

"No displacement shall take place, from any project or activity (if funded in whole or in part by MCA supplemental grant funds) prior to HUD approval of a relocation activity work program and budget."

Defendant urges that during the operation of the First Year Action Program (1) not one person can be displaced as a result of the Model City Project until a full relocation plan is formulated and approved; and (2) a proposed full relocation plan will shortly be formally submitted to HUD approval.

Plaintiffs assert that the Chicago Plan indicates that during the first year of the operation of the program there will be displaced 1200 families and 300 single persons. (Stip.Ex.D2, Part III, 501). Such displacement will be effected by other programs outside the Model City Program, although no Model City funds are being used in such programs. Thus residents of the Model Cities areas are being displaced and relocation being made without regard to the Ability to Pay Standards set forth in CDA Letter 5, paragraph 4:

"A displacee is not offered a reasonable choice of relocation housing if he is expected to pay more than 25 percent of his annual gross income for rent and utilities, excluding telephone service. For this purpose, gross income is defined as total family income excluding all income of minors and minus $300 for each minor. Neither the exclusion nor the $300 exemption applies to a minor spouse."

The City of Chicago had indicated in its submitted Plan that

"At the present time there are no housing or rent subsidy programs applicable in the City of Chicago which can produce standard housing at the cost which would meet this criteria. Two approaches will be used in such cases (1) efforts will be made to attempt to increase the earning power of the family, and (2) housing referrals will be made not to exceed 33% instead of 25% of the income for rent as computed by the formula in this criteria."

The Initial Response of the Coordinating Federal Agencies to that phase of the Plan indicated its disapproval because of non-compliance with the regulation, but decided that since that issue might be resolved before the full plan was submitted, approved the interim plan.

Displacement of the area residents is occasioned under the Urban Renewal Program of the National Housing Act, 42 U.S.C. § 1441 et seq., and relocation arrangements are made in accord with standards set forth in §§ 1455(a) and 1465(c). Plaintiffs state that such displacees in a Model Cities Area are entitled to relocation under the Ability to Pay standards of the Model Cities Act regulations which cover individuals as well as families and which cover cost of utilities as well as rent.

■ The coalescing of the provisions and regulations of thse two national urban renovation statutes is not a matter for this court's judgment except insofar as rights secured thereunder be protected. The concern over the financial impact of displacement is reflected in both and each Act assures that a displaced person be free from economic injury. The Model Cities Act in § 3307 requires that the regulations thereunder "meet relocation standards equivalent" to those under the National Housing Act.[3]

■ The differences in the manner of assuring economic protection to a displacee does not rise to the stature of a protected right and is not a matter for judicial judgment. It is in the complete exercise of the legislative authority of the administrative body and/or Congress.

■ Recent legislation provides for federal financial assistance to aid housing authorities in meeting statutory requirements that rent may not exceed one-fourth of a tenant's income. Housing & Urban Development Act of 1969, Pub.Law 91–152. Where relocation is made to public housing projects, Chicago with such assistance will be able to achieve HUD's relocation requirements. Also, defendant has indicated that Chicago's full relocation plan is now being reviewed for formal submission to HUD.

In these circumstances, the court finds that no irreparable injury is occurring under displacements pursuant to the National Housing Act as distinguished from that of the Model Cities Act, and the motion for preliminary injunction is denied.

■ The plaintiff's motion for partial summary judgment on the basis of the admitted facts underlying the preliminary injunction motion must also be

denied. The defendant's temporary waiver of full compliance with the Ability to pay standards set forth in his regulation was within the exercise of his discretion, was under all the admitted circumstances a reasonable exercise of that discretion, and was done without violating any of the plaintiffs' rights.

An order has this day been entered overruling defendant's motion to dismiss, denying plaintiffs' motion for preliminary injunction and for partial summary judgment.

---

3. Under § 1465(c) of the National Housing Act, a displacee is entitled to reasonable and necessary moving expense not in excess of $200, and where housing is not available in low rent projects, is further entitled to monthly payments not to exceed $500 for the first 12 months and $500 for the second 12 months, which amount when added to 20% of the displacee's annual income equals the average annual rental required for "decent, safe and sanitary dwelling of modest standards adequate in size to accommodate the displaced individual or family * * *".