**Jose L. RODRIGUEZ et al., Plaintiffs,**

v.

**Carlos Romero BARCELO, Mayor of San Juan, Puerto Rico, et al., Defendants.**

**Civ. No. 842–71.**

United States District Court,
D. Puerto Rico.
May 15, 1973.

James A. Toro, Nachman, Feldstein & Gelpi, José Roberto Lugo, San Juan, P. R., for defendants.

## MEMORANDUM OPINION AND ORDER

CANCIO, Chief Judge.

The San Juan Model Cities Program was created by the Municipality of San Juan and developed and funded under the Demonstration Cities and Metropolitan Development Program, 42 U.S.C.A. § 3301 et seq. Under this program, a low income sector of the city has been designated a target area and a large quantity of federal funds has been granted to develop, restore, and rebuild the area. Since one of the requirements and purposes of the program is the widespread participation of the citizenry of the area, a council, denominated the Concilio de Residentes de Ciudad Modelo, Inc., was created to provide for this participation.[1]

As a result of a prior complaint in this Court, Civil 361–70, the methods and procedure for the election of the Board of Directors to the Concilio were stipulated and approved by us. Thus, the members of the Board are chosen in elections held every two years in the area. These are supervised by a Board of Elections composed of five members, three chosen by the Concilio and two by the City Demonstration Agency (CDA), an agency of the Municipality of San Juan which administers the program.

This complaint was filed on October 29, 1971, shortly before the date set for

Pedro J. Varela, Harry· Anduze, San Juan, P. R., for plaintiffs.

---

1. In addition to the directives of the Department of Housing and Urban Development, which handles the federal aspect of the program, the citizen participation requirement is derived from the law: 42 U.S.C. § 3303(a)(2) makes a program eligible for federal assistance only if it provides for "widespread citizen participation" and Section 3303(b)(1) requires the Secretary of Housing and Urban Development to "emphasize local initiative in the planning, development, and implementation" of the program. The federal assistance in the program must be in "prompt response to local initiative", Section 3303(b)(2). See in this respect: North City Area-Wide Council, Inc., v. Romney, 3 Cir., 428 F.2d 754 (1970); Coalition for United Community Action v. Romney, D.C., 316 F.Supp. 742 (1970); and Lower Kensington Civic Association v. Watson, D.C., 330 F.Supp. 1257 (1971).

This requirement is also clearly implied in the congressional findings and declaration of purpose, 42 U.S.C. § 3301, which requires that the program be "locally prepared and scheduled".

the registration of voters and council elections for 1971. The Concilio as it was then constituted and several residents of the area purporting to represent all the residents, sought to enjoin the Mayor of San Juan, the Municipality of San Juan, the Director of CDA and the members of the Board of Elections from engaging in certain activities which were said to invalidate and affect citizen participation in the upcoming elections.

On October 29, 1971 a Temporary Restraining Order was issued against the defendants and on November 2, 1971 it was vacated and injunctive relief was denied after it was demonstrated to the court that certain of the acts complained of had been rescinded and that other allegations were not true.[2] The court retained jurisdiction to decide whether future declaratory relief was warranted.

After this order, a question was presented to the court as to the composition of the Board of Elections, and contempt proceedings were brought against Néstor Carrasquillo, then President of the Concilio de Residentes. These matters were disposed of on November 5, 1971 when the court exonerated Mr. Carrasquillo and determined who should constitute the Board of Elections.

The elections were held and, on January 13, 1972, through new counsel, the plaintiffs filed a motion for preliminary injunction seeking to enjoin the newly elected members of the Concilio from taking office and an order annulling the elections to the Council.[3] They also requested new elections, and that the Director of the City Demonstration Agency and the City Administration be restrained from exerting undue influence in the new elections. In addition, a motion to dismiss was filed by the CDA Director and the Board of Elections. After several continuances, a hearing was held on April 12, 1972. At the end of argument on that date, the court withheld its ruling on the dismissal and plaintiffs started to present their evidence. On the fourth day of hearings, the parties stipulated that the evidence presented was for all purposes including relief on the merits of the petition.

On April 20, 1972, after plaintiffs rested, defendants renewed their motions for dismissal.[4] The court considered the motions as being in the nature of a motion for non-suit and dismissed as to the Mayor of San Juan, Carlos Romero Barceló, in his official capacity and as to the Municipality of San Juan. The action was allowed to continue as to Romero Barceló personally (but see footnote 7, *infra*) and the dismissal was also denied as to the remaining defendants. A written order was entered as to the ruling on the Mayor and the Municipality on April 25, 1972. After this, the remaining defendants presented their proof and the parties submitted posttrial memoranda in lieu of closing arguments.

Our rulings of April 20, 1972 passed on very important threshold issues which we will elaborate.

Normally, cases related to the operation of the Model Cities Program have been brought against the Secretary of Housing and Urban Development, against the city and its agency in charge of the program, and against the persons who manage the program directly. Thus, in Benson v. City of Minneapolis, D.C., 286 F.Supp. 614 (1968), it is held

---

2. The Court found that the voter qualifications which were claimed to exist were never imposed and that the requirements to be a candidate, such as literacy, had been rescinded by the Board of Elections. Plaintiffs' last complaint was that additional registration days had been scheduled. This the Court considered to be a move designed to facilitate rather than to hinder citizen participation.

3. How they sought to enjoin the newly elected members without making them parties to the action remains a mystery.

4. Defendants Romero Barceló and Municipality of San Juan's Motions were oral motions.

that HUD may not be sued and it is stated that suit must be brought against the Regional Director of the agency. In North City Area-Wide Council, Inc. v. Romney, 3 Cir., 428 F.2d 754 (1970), suit was brought against the Secretary of Housing and Urban Development, the Mayor, and the Administrator of the city program. In Coalition for United Community Action v. Romney, D.C., 316 F.Supp. 742 (1970), the Secretary of Housing and Urban Development was included but the city was omitted. The court then ruled that the city was a desirable party but not indispensable. In Lower Kensington Civic Association v. Watson, D.C., 330 F.Supp. 1257 (1971), the head of the model cities program for the city in his personal and official capacity was the defendant.

Jurisdiction in the cases has been found under 28 U.S.C. § 1331 (federal question) when the jurisdictional amount is alleged. *North City Area-Wide Council, Inc., supra, Coalition for United Community Action, supra.* The courts have also found jurisdiction under 28 U.S.C. § 1361 (mandamus against a federal officer), *North City Area-Wide Council, Inc., supra, Coalition for United Community Action, supra,* and *Lower Kensington Civic Association, supra.* The other alternative for jurisdiction in these cases has been the Administrative Procedure Act, 5 U.S.C. § 701 et seq. See *Benson v. City of Minneapolis, supra.*[5] *North City Area-Wide Council, Inc., supra, Coalition for United Community Action, supra,* and *Lower Kensington Civic Association, supra.*

The plaintiffs in this case chose to ignore these precedents and alleged jurisdiction under the Fifth and Fourteenth amendments to the Constitution of the United States, under 42 U.S.C. § 1983 (action for deprivation of civil rights), and under 42 U.S.C. § 3301 et seq. (The Comprehensive City Demonstration Program). In addition, they neglected to include the Secretary of Housing and Urban Development or the Regional Director of the Agency, choosing to pursue their action against those defendants who have local flavor.

■ The characterization of this action as arising under the Fifth and Fourteenth amendments to the Constitution of the United States is not accurate. The right to participate in the formulation and operation of the Model Cities Program is derived exclusively from the law creating the program and approaches but is not of the same magnitude as the right of the citizens to participate in the electoral process. While the method of choosing the citizen representatives to the Model Cities Program in San Juan resembles an election, it is not truly one, and the right to participate in the process does not partake of the constitutional nature of the electoral process.

■ In alleging a claim under 42 U.S.C. § 1983[6] and, impliedly, jurisdiction under 28 U.S.C. § 1343(3) and (4), the plaintiffs run into some difficulties, although surmountable. In the first place, we must determine whether the right to participate in the Model Cities Program is protected by Section 1983. This may be done since the statute refers to the "deprivation of any rights, privileges or immunities secured by the Constitution *and laws*". This seems to be a specially appropriate case to apply

---

5. In *Benson* the standard of "aggrieved party within the meaning of the statute" required for review under 5 U.S.C. § 702 was said to have not been met by an individual resident of the area at a very early planning stage of the program. In the present case the program is in operation and it is a class action.

6. 42 U.S.C. § 1983 reads as follows: "Civil action for deprivation of rights.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress".

the part of Section 1983 relating to the "laws" of the United States since, under the Model Cities Program as it operates in San Juan, the municipal employees are in a position where they can effectively negate the required citizen participation in the program, and the rights protected certainly partake of a constitutional flavor. (See conclusion of law [6] *infra.*)

■ Another problem presented in applying the civil rights section is whether the remaining defendants are state or federal employees.[7] This problem was disposed of in our ruling of April 20, 1972 by referring to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). If the defendants are local employees, the Section 1983 will apply; if they are federal employees, then, under Bivens, there is an action whenever a federally guaranteed right is violated.

We realize that it is not at all clear that the *Bivens* doctrine allows an action for the vindication of a right arising under a law of the United States, vis a vis a right arising under the Constitution. But, if *Bivens* is not applicable and the employees are federal employees, then we still have jurisdiction under 28 U.S.C. § 1361 [8] and under the Administrative Procedure Act.

The courts have been consistent in cases brought under the citizen participation provisos of the Demonstration Cities Act, in finding that 28 U.S.C. § 1361 and the APA give jurisdiction to the federal courts. *Benson, supra, North City, supra, Coalition, supra, Lower Kensington, supra.* We cannot use 28 U.S.C. § 1331,[9] which is normally used, because there has not been an allegation or proof of jurisdictional amount in this case.

■ When we make use of the additional jurisdictional grounds which we have now discussed, we notice that in most of the cases the regional director or the Secretary of Housing and Urban Development were made parties to the action. These are the ultimate custodians of the resident's right to participate in the policy making of the Model Cities Program since they control the purse strings. However, in *Lower Kensington, supra,* where the director of the city agency was the defendant, the court was not troubled by their absence, we conclude that, while it would have been desirable and the best practice to have the regional director and the Secretary of Housing and Urban Development as parties defendants in this action, their presence is not indispensable.

We can understand why these Housing and Urban Development officials were not included by plaintiffs. They sued the persons who they felt were directly violating the residents' right to participate in the formulation of the Model Cities Program. The Board of Elections was responsible for the way in which the elections were to be run. The Director of the City Demonstration Agency was the person who ran the program in a day to day basis. The city and the Mayor of San Juan were the ones who allegedly interfered directly with the plaintiffs' right to participate

7. As stated before, the Mayor of San Juan in his personal capacity was never served with summons and the action against him in his official capacity and against the City was dismissed, so, the Director of the CDA and the members of the Board of Elections are the only remaining defendants.

8. 28 U.S.C. § 1361 reads as follows: "Action to compel an officer of the United States to perform his duty. The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff".

9. 28 U.S.C. § 1331 reads as follows: "Federal Question; Amount in Controversy; Costs. (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States".

in the decision-making process of the program. The parties not included in the complaint, the Regional Director and the Secretary of Housing and Urban Development, did not personally participate in the alleged wrongful conduct, so that, perhaps in the rush to file their petition several days before the first registration date, they were omitted. This omission may be further explained when we remember that plaintiffs were thinking in terms of a civil rights action and not on the typical action filed in Model Cities citizen participation cases.

The omission of the Regional Director and the Secretary of Housing and Urban Development did not affect the fact finding process in this case. The court is satisfied that with the parties represented, the necessary facts of the case were brought out. The plaintiffs presented their evidence tending to show the manner in which citizen participation was denied, while counsel for defendants ably cross-examined witnesses and presented his case trying to show that the required participation was permitted and was not affected. We cannot conceive what additional evidence could have been presented before us by the Housing and Urban Development parties to change our appreciation. In addition, these officials will not be directly affected by our decision in the case. The only noticeable effect of their absence will be to limit the scope of our remedy since we cannot legally direct it towards them.

Having disposed of this problem, the only preliminary matter remaining is plaintiffs' request to be certified as a class.

■ Rule 23(a) and (b) of the Federal Rules of Civil Procedure reads:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating

the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action".

Once the requirements of paragraph (a) are met, only one of the requirements of (b) is needed to allow a finding of a class action. Yafee v. Powers, 1 Cir., 454 F.2d 1362 (1972).

■ All the criteria of paragraph (a) are met in this action. The class to be represented is that consisting of all the residents of the San Juan Model Cities target area. It is undisputed and obvious that such a class is "so numerous that joinder of all members is impracticable". The questions of law are common to the class: what degree of citizen participation is required in the Model Cities Program and if that requirement has been met under the facts presented to the court. The relevant claims of the representative parties are typical of the claims of the class. They consist of the widespread propaganda and influence used by non-residents so as to unduly influence the results of the elections so that the Concilio stopped being representative of the residents of the area. Finally, the interests of the class have been fairly and adequately represented in this action.

Of the requirements in paragraph (b), the criterion in subsection (1)(B) is met since, if this action were not a class action, an adjudication as to individual members of the class would, as a practical matter, dispose of the interests of the other members not parties to the class.

■ In defining the class as we do, that is, the residents of the target area of the San Juan Model Cities Program, and by characterizing the action as one to secure the required citizen participation in the program, it becomes apparent that the Concilio itself is not a proper party plaintiff. In addition, since the action commenced, its composition has changed and it is precisely its composition and representativeness which is in question. For that reason, the action on its behalf is hereby dismissed.[10]

On the merits, the court makes the following

### FINDINGS OF FACT

(1) The Model Cities Program in San Juan is funded with federal resources appropriated by authority of Public Law 89–754, Demonstration Cities and Metropolitan Development Act of 1966. The Program is administered by the City Demonstration Agency for the Municipality of San Juan. This agency falls under the Office of the Mayor of San Juan, even though its director and all the other employees are paid by federal funds.

(2) In San Juan's Model City Program, the citizen participation required by the Federal legislation and Housing and Urban Development directives is funneled through the Concilio de Residentes, elected by the residents of the Model City target area for a period of two years.

(3) Registration of voters and elections to the Concilio de Residentes were scheduled and held in 1971 as follows:

Registration: October 30 and 31 and November 13 and 14

Elections: November 28

(4) These proceedings were supervised by a Board of Elections composed of defendants Tomás Clemente Benítez, José C. Gómez, Victor M. Rosario, Miguel Solla Agueria, and Manuel Orta Peroza.

■ (5) The elections to the Concilio de Residentes de Ciudad Modelo, Inc., held on November 28, 1971, were affected by the conduct described herein so as to turn the whole proceedings into a sham. This conduct consisted of the following:

A - In 1971 the Mayor of San Juan and the then members of the Concilio

10. Since the action on behalf of the Concilio is dismissed, we do not enter into the letter in which the new Concilio requests to withdraw from the action.

disagreed as to the manner in which the program funds designated for recreation were being used. As a result of this, Mr. Luis Kortright, who at the time was Administrator of the CDA, wrote and had distributed in the community a hand bill claiming that some persons wanted to stop the program so as to handle the federal funds themselves and urging the residents to prevent this from happening (Plaintiffs' exhibit No. 4). This was to be the beginning of the City Administration's campaign to influence the elections to the Concilio.[11]

B - Before the time for election came, there were seven area coordinators who served as liaison between the community and the administrators of the program and who were in the payroll of the Administration. Their number was raised to fourteen and the additional coordinators were concentrated in the area where the residents had shown more opposition to the Administration of the Program and to the Mayor of San Juan.

C - On November 10, 1971, shortly before the Council elections, a meeting was scheduled by Mr. Tomás Clemente, the coordinators' supervisor. A Model Cities' vehicle with loud-speakers was used to publicize this meeting, which was held on that same day. The purpose of the meeting was stated to be "orientation". Among the "orientation" given at the meeting was a speech by Mr. Danny López Soto, a member of the House of Representatives for the same party to which the Mayor belongs, who urged the residents present to remove from the Council those who he said opposed the Administration, such as Mr. Néstor Carrasquillo (who, incidentally, is a politician himself, belonging to a different party) who he called a commu-

nist and a separatist.[12] Mr. López Soto concluded his speech by inviting the residents to one of his party's political meetings.

Other politicians, members of the Mayor's Party who were present at the "orientation" meeting, were Senators Juan Palerm and Orlando Parga, Jr., and Mayor Carlos Romero Barceló himself. Among other things, it was stated there that, at the time, the Concilio was controlled by communists.

D - A letter highly critical of Néstor Carrasquillo, which was sent to the Mayor of San Juan by Mr. Francisco Caraballo a long time before the elections was never answered. Yet, it was reproduced and widely distributed in the community shortly before the elections in which Mr. Carrasquillo was a candidate for reelection. Incidentally, by that time Mr. Caraballo and Mr. Carrasquillo had settled their differences and what was published was no longer Mr. Caraballo's concept of Mr. Carrasquillo.

E - In a letter dated November 22, 1971, six days before the elections (Exhibit 11) and addressed to the residents of the target area, the Mayor of San Juan indicated that some of the members of the Concilio (which were not identified in the letter) were obstructionists and constituted a menace to the welfare of the community. The Mayor advised the residents to vote *"for those men and women that are willing to forget their personal interests, and that will push or support the Model Cities Program"*. (Emphasis in the original)

F - During the last days of the campaign, a large leaflet captioned "Papeleta Ganadora" (Winning Ballot), which contained the names and photographs of the candidates for the Concilio favored by the City Administration, was pro-

---

11. Since the conduct of the Mayor of San Juan and of some of the employees of his Administration was instrumental in denying and affecting the citizen participation in the program, it must be described herein, just as the conduct of other persons, not parties to the action, is also described.

12. "Separatists" is the term used in Puerto Rican politics to describe the advocates for independence for Puerto Rico and is frequently used as a derogatory term by many non-advocates for independence.

duced and distributed in large quantities in the target area.[13] These leaflets resembled the official ballots and the official information posters, in the type of print used and the size of the candidates photographs, which were the same. The only difference between the documents was that the "Winning Ballot" did not include the names and photographs of the candidates not favored by the Administration. The photographs of the favored candidates were identical in all the official documents related with the elections, and were in the same position, all in the first row. The official ballot itself was no exception.

It may be fairly stated that the "Winning Ballot" was an exact replica of the official ballot and of the official information poster for each sector, but with the not-favored candidates excluded and propaganda for the favored candidates included instead.[14] It is also apparent that the documents were prepared in the same place, and the court finds that they were prepared by employees of the Program Administration, who designed and distributed the documents.

In this respect, defendant Tomás Clemente, President of the Board of Elections, testified that they conceived the idea of preparing and distributing an official information poster. He admitted in cross-examination that the position and order of photographs in the information posters and in the winning ballots were the same in each sector. Mr. Clemente also explained that the candidates' photographs and data were received by the Board of Elections and sent to the offices of the Program Administration for the preparation of the election material, including official ballots and information posters.

In addition, CGA coordinators Héctor Rivera and David Alamo were seen two days before the elections, on November 26, 1971, at around 2:30 PM, by witness Ketty Diaz, leaving the Program Administration office in Old San Juan at the old El Mundo Building, carrying a box which appeared to contain "winning ballots". The box was similar to the one which the partes stipulated to contain 3,000 "winning ballots" (see footnote 13, *supra*) and had a "winning ballot" pasted on the outside, similar to exhibit 16 ("Las Corozas" section of the target area). On that occasion, when the "winning ballot" was mentioned to Mr. Rivera, the coordinators left the elevator in a hurry and placed the boxes in an awaiting white Model Cities vehicle, manned by a Mr. Gómez, a Model Cities official. Several similar boxes were observed in the vehicle by Miss Diaz before Mr. Gómez and the coordinators left in the vehicle.

The distribution of the "winning ballots" by coordinators was further demonstrated by the testimony of Mrs. Amelia Ortiz, who received one from coordinator Cruz Camacho, who was distributing them at Condominio Bahía B, where he was also observed by Mrs. Ketty Diaz. The condominium is located in the Tras-talleres sector of the target area, where Mr. Cruz Camacho is a coordinator. Various witnesses also observed coordinators Virginia Ortiz and Héctor Rivera distributing the "winning ballots".

G - The coordinators and other Model City Program employees were engaged in the distribution of other hand bills, in addition to the "winning ballot", which we have described above. This other propaganda was directed to benefit some candidates and to discredit others. Mr. Carrasquillo testified that he saw various coordinators distributing plaintiffs'

13. A box containing 3000 copies of the "Winning Ballot" for the Figueroa Sector (Exhibit 3) was not presented into evidence by the plaintiffs, but the parties stipulated that it did contain the documents.

14. See, in this respect, Exhibit 1—information poster for the Buenos Aires Sector of the target area; Exhibit 2—a "winning ballot" for the same sector, and Exhibit 18—the official ballot for that sector.

Exhibit No. 9.[15] Mrs. Ketty Diaz stated that she saw some children distributing plaintiffs' Exhibit No. 14.[16] She took the copies they had and the children complained to the persons who had given them the propaganda. They were Model Cities coordinators who then came to talk with her and, as a result, she returned the propaganda to them. Mrs. Diaz also observed Mr. José Cuevas, Coordinator of the Nemesio Canales Sector, pasting a hand bill similar to plaintiffs' Exhibit No. 15 [17] on the glass wall of the office next to the Concilio's office so that all residents that came for services would have to see the poster.

H - The official intervention with the elections is also illustrated by the fact that the favored candidates had their names and photographs placed first in the ballots.

15. The translated text of Exhibit 9 reads as follows: "Néstor Carrasquillo, Ramón Rodriguez (Blackie) from Figueroa, Wilson Rodriguez from Buenos Aires, Juan Ponce Almeida from Tras Tallenes and the Young Lords have failed in their attempt to paralyze the elections in Model Cities.

The Honorable Judge Cancio decided in favor of the Community by permitting the registrations and elections, to elect the new Council of Residents in Model Cities.

The presence of more than thirty (30) Young Lords and Ketty Diaz in support of Néstor Carrasquillo were of no importance in court. The Judges are not intimidated by pressures exerted by groups with bad intentions. Carrasquillo and his trained followers failed in their plot. The residents do not let themselves be fooled and know who is right.

Resident, the hour has arrived, you have in your hands the opportunity of eliminating, once and for all, the obstacle in your path.

The Court ruled in favor of Model Cities and the residents. The election will be carried out as originally planned. Register and vote.

REGISTRATIONS
Saturday 6 of November 1971
Sunday 7 of November 1971
Saturday 13, November 1971
Sunday 14, November 1971"

16. Exhibit 14 is a reproduction of an article in "El Mundo" which, translated, reads:
"Judge Hiram Cancio summoned the President of the Model City Council to appear in Court in this afternoon to show cause why he should not be punished for contempt of court.

In an order to that effect issued at 2:50 PM yesterday afternoon by Judge Cancio, it is stated that Néstor Carrasquillo, as soon as the Federal Court denied the injunction by which Carrasquillo was trying to paralyze the registration and elections among Model City Residents, on his own account, he dismissed the Model City Election Board and elected a new one in an illegal form and in direct violation of the Federal Court order.

The order dismissing the injunction was issued Tuesday afternoon. Such order left the way open for the holding of the registrations on the 6th, 7th, 13th, 14th of November and the elections on the 28 of the current month.

But that same night, according to Cancio's order, Carrasquillo called a meeting in which the Election Board was dismissed.

Carrasquillo named another Board in which his brother is the President.

It was then that the San Juan Mayor, Carlos Romero Barceló, and the dismissed Election Board, went to the Federal Court through Harvey Nachman, asking that Carrasquillo be accused of contempt.

In his order, Cancio specified that he had ordered that everything remained the same, and that the plans for the elections should continue as planned.

Cancio points out that Carrasquillo has been at all times intervening unlawfully with the operations of the Resident's Council and with Election Board, who has only being trying to carry out the election procedures in a democratic and orderly manner.

Cancio points out that Carrasquillo has neither force of law nor of the by-laws of Model City to dismiss the Election Board.

According to the order, Carrasquillo, after the dismissal of the Board, sent for two members of the Board and advised them that the old Board did not exist.

One can see from Cancio's order the anger caused to him by the fact that his order was so openly disregarded".

17. Exhibit 15 is a handbill which, translated, reads:
"The moment has arrived. Lets all get registered and vote. Lets give the enemies of the Caño their final blow. Carrasquillo get out.—Friends of Model Cities Committee".

(6) Defendant Alfredo Maldonado was the Director of the City Demonstration agency for the Municipality of San Juan and, as such, was responsible for the administration of the program and supervised the persons identified as CDA employees whose activities have been described above. It is true that, as a newcomer to the position of Director, he did not personally participate in the bulk of the activities which affected the elections to the Concilio. However, he was the program overseer and he looked the other way allowing the conduct to continue. As such, he remains a proper defendant even though others, like the Mayor, whose actions are more reprehensible, are no longer in the case.

(7) Twenty-four out of twenty-five Concilio members elected belonged to the Mayor's party.

On the merits of this case, and in view of the facts described above, the court issues the following

### CONCLUSION OF LAW

1 - The Court has jurisdiction in this case under 42 U.S.C. § 1983 (*supra,* footnote 6), and 28 U.S.C. § 1343(3) and (4) in the case of those defendants who are not federal employees; under 28 U.S.C. § 1361 (*supra,* footnote 8) in the case of those defendants who may be federal employees; and under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. and the Demonstration Cities and Metropolitan Development Act, 42 U.S.C. § 3301 et seq., in the case of all the defendants. See, in this respect, the *Bivens, Benson, North City Coalition,* and *Lower Kensington* cases, cited above.

■ 2 - Under the Demonstration *Cities Act, supra,* widespread citizen participation is required and the residents of a target area must participate in the implementation of the act and in the determination of new policies or changes in existing basic strategy of the program. See, in this respect, 42 U.S.C. §§ 3303(a)(2), 3303(b)(1), 3303(b)(2) and cases cited in footnote 1, *supra.*

■ 3 - The citizen participation requirement in the Demonstration Cities Act is not met by the participation of the members of the Concilio de Residentes chosen in the elections held in November 28, 1971 in the administration of the program, since the elections were not free and democratic and the Concilio is not representative of the citizens of the target area, and, therefore, is not an adequate and proper method for achieving the required citizen participation.

4 - The residents of the target area in the San Juan Model Cities Program have been deprived of the participation required under the law and directives, at least since the persons chosen in the elections of November 28, 1971 took office in the Concilio de Residentes.

■ 5 - For the Concilio de Residentes to be the proper means towards achieving the end of citizen participation in the program, it must be truly representative of the residents. The elections to the Concilio must not be subject to undue outside influences and the will of the residents should not be affected by politicians nor by members of political machineries, specially by those in official positions of power related directly or indirectly with the Program.

This was not the case in the elections held in November 28, 1971 where the facts clearly show that the Mayor of San Juan, his employees, employees of the Program, and other politicians and their agents massively intervened in the elections and unduly influenced the results.

6 - The right to participate in the Demonstration Cities Program, even though created by law, is of a great importance, approaching constitutional rank, and, as such, is actionable under 42 U.S.C. § 1983 and under the doctrine expressed by the Supreme Court in Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). This is an urban development program aimed at thoroughly changing the life of the residents of the area, in more extreme ways than

some political revolutions have not been able to do. The congressional findings and declaration of purpose of 42 U.S.C. § 3301 serve to illustrate the extreme impact the program is intended to have in the lives of the residents of a particular area. The purpose of the act is said to be to provide assistance to the cities:

" . . . to plan, develop, and carry out locally prepared and scheduled comprehensive city demonstration programs containing new and imaginative proposals to rebuild or revitalize large slum and blighted areas; to expand housing, job, and income opportunities; to reduce dependence on welfare payments; to improve educational facilities and programs; to combat disease and ill health; to reduce the incidence of crime and delinquency; to enhance recreational and cultural opportunities; to establish better access between homes and jobs; and generally to improve living conditions for the people who live in such areas, and to accomplish these objectives through the most effective and economical concentration and coordination of Federal, State, and local public and private efforts to improve the quality of urban life".

By reason of the aforesaid, the court declares, orders, and adjudges as follows:

1 - The elections to the Concilio de Residentes de Ciudad Modelo, Inc., held on November 28, 1971, were unduly influenced by the action taken by persons not residents of the City Demonstration Area of San Juan, Puerto Rico, as described herein and, as such, were null and void.

2 - Since the date in which the persons elected in the aforesaid elections took office, there has not been the required resident participation in the program.

3 - For there to be the required citizen participation, new elections to the Concilio must be held or the Concilio must be substituted as the means for such participation and a new method developed for citizen participation.

4 - If new elections are held, they may not be subjected to the outside influences such as those which affected the elections of November 28, 1971.

5 - If the Council is to be substituted, and a new method for participation developed, the decision to substitute it must be made with citizen participation.

6 - Representatives of all parties should meet and a study of the Constitution of the Concilio de Residentes should be made to take the necessary steps to remedy, through institutional means, the serious defects which have allowed the facts described above to happen and which have required the intervention of this court in more than one occasion.

7 - Defendant Alfredo Maldonado, Director of the City Demonstration Agency, shall take all the steps necessary to comply with the purposes and provisions of this Opinion and Order and shall submit a plan of compliance, as well as a report of the steps taken, within the next thirty (30) days, for approval of the court, with notice to plaintiffs.

8 - If a new method for participation does not appear feasible within the next thirty (30) days, new elections to the Concilio must be held within the thirty (30) days thereafter.

9 - The action of plaintiff Concilio de Residentes de Ciudad Modelo, Inc., is dismissed.

It is so ordered.