Prudencio T. FELICIANO et al.,
Plaintiffs,

v.

George ROMNEY, Secretary of the Department of Housing and Urban Development, et al., Defendants.

No. 71 Civil 1575.

United States District Court,
S. D. New York.

July 19, 1973.

See also, D.C., 336 F.Supp. 1340.

Cora T. Walker, New York City, for plaintiffs.

Whitney North Seymour, Jr., U.S. Atty., S.D., N.Y., New York City, for

defendants Romney and Green; Dennis J. Helms, Asst. U. S. Atty., of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants Rockefeller and Logue; Stephen P. Seligman, Asst. Atty. Gen., Debevoise, Plimpton, Lyons & Gates, New York City, of counsel.

Norman Redlich, Corp. Counsel, New York City, for defendants Lindsay, Walsh, Williams and Golar; Judah Dick, Asst. Corp. Counsel, of counsel.

EDWARD WEINFELD, District Judge.

In April 1971, the ten named plaintiffs commenced this suit individually and as a class action on behalf of all indigent families residing in the Milbank-Frawley Circle I Urban Renewal Area (hereafter Milbank-Frawley). The complaint alleges in essence that the governments involved—city, state and federal —have failed in their obligations both under the Constitution and federal statutes by not providing area residents with the required relocation, rehabilitation, and site maintenance for present structures, adequate jobs and job training on a nondiscriminatory basis, and that they have actively interfered with an organization representing the community. The instant motion seeks to dismiss the complaint for lack of federal jurisdiction, failure to state a claim, and because primary jurisdiction to decide all issues raised is in the Department of Housing and Urban Development ("HUD"). If these motions fail, defendants seek to deny plaintiffs class action status.[1]

The Milbank-Frawley Circle I Urban Renewal Area, located in the center of the Harlem Community, is bounded generally by 125th Street on the north, 110th Street on the south, Park Avenue on the east and Lenox Avenue on the

---

1. While this opinion will refer to the defendants as a group, the federal defendants have joined in this motion to the extent that they argue the complaint fails to state a claim because there is no contract for loan or grant between the City and HUD for Milbank-Frawley and that there has been no final administrative action by HUD which has primary jurisdiction and that plaintiffs must exhaust their administrative remedies.

west. The area covers forty square blocks of substantially substandard housing, vacant land and public facilities, and is divided into some forty-five sites, twenty of which the City has already acquired as "early action" sites on which there are 1,800 apartments of slum housing slated to be replaced by 2,640 units of new and rehabilitated housing. The entire area contains some of Harlem's poorest housing stock. This neighborhood is in turn located within the federally financed Harlem-East Harlem Model Cities area (Harlem-East Harlem), a neighborhood three times as large as the Milbank-Frawley area. Numerous agencies and programs, apart from and unrelated to Milbank-Frawley, function within the Harlem-East Harlem Model Cities project. Milbank-Frawley is an urban renewal project, whereas Harlem-East Harlem is a model cities neighborhood project. They are separate and distinct programs. They are to be developed and funded under different statutes with different goals, although intended to advance interrelated national objectives of housing and community needs.

Plaintiffs seek to represent approximately 7,000 families, consisting of 50,000 persons, almost entirely Blacks and Puerto Ricans of low income, who resided in the Milbank-Frawley urban renewal area in August 1970. At that time, when the City acquired the twenty "early action" sites,[2] approximately 1,700 families lived on those sites; only 800 families remained at the beginning of 1972. The other site residents were relocated into standard housing; many of them into public housing. The plaintiffs resided on early action site 23,[3] a single block, when this action was commenced, but have since been relocated. Presently under construction on that site are two thirty-five-story towers and one twelve-story building, known as Frawley Plaza, scheduled for completion in December of this year. It will replace approximately 150 slum apartments and when completed will house 600 families of low and moderate income and will have three community facilities, including two day care facilities and a new home for the North Side Center Development.

All of the defendants save one[4] are officials of the city, state and federal governments who are involved in the Milbank-Frawley and Harlem-East Harlem Model Cities projects; they are sued both as individuals and in their official capacities.[5]

It is important to a determination of the present motion to note the separate nature of the two undertakings and to sketch the operational framework of the two major federal statutes involved—the Demonstration Cities and Metropolitan Development Act of 1966[6] ("the Model Cities Act"), and the Housing Act of 1949[7] ("the Housing Act"), under which urban renewal projects are authorized—and the manner in which they have been

---

2. A site is a development parcel consisting of a small area set aside for a specific type of development.

3. Site 23 is bounded generally from East 110th Street to East 111th Street, extending from Madison Avenue to Fifth Avenue, and is centrally in the southern half of the Milbank-Frawley Circle I Urban Renewal Area.

4. Dr. Mamie Phipps Clarke is Chairman of the 110th Street Plaza Development Corporation, developer of Frawley Plaza.

5. The City defendants are John V. Lindsay, Mayor of New York City; Albert A. Walsh, Administrator of the Housing and Development Administration of the City of New York (HDA); Joseph E. Williams, Administrator of the Model Cities Administration, and Simeon Golar, Chairman of the New York City Housing Authority. The federal defendants are George Romney, Secretary of the Department of Housing and Urban Development (HUD), and S. William Green, Regional Administrator of HUD. The State defendants are Nelson Rockefeller, Governor of New York, and Edward J. Logue, President of the New York State Urban Development Corp. (UDC).

6. 42 U.S.C. §§ 3301–3374.

7. *Id.* §§ 1441–1490d.

implemented in the Milbank-Frawley and Harlem-East Harlem projects.

## THE MODEL CITIES ACT

The Model Cities Act was passed to upgrade the total environment of the nation's urban slums and blighted areas, to better the living conditions of its residents and to increase the supply of housing for low and moderate income families not satisfied by existing programs. Its objectives are more comprehensive than those of the programs under other national housing acts. It is designed to concentrate public and private resources in a comprehensive five-year attack on the social, economic and physical problems of slum and blighted neighborhoods. Its broader purpose is to improve educational facilities and programs; to combat disease and ill health; to reduce crime and delinquency; and to enhance recreational and cultural opportunities—as well as to expand housing and job opportunities.[8] It seeks to accomplish these ends by aiding localities in the planning and implementation of "comprehensive city demonstration programs," the locally developed and scheduled plans providing for a coordinated federal, local and private effort to implement the Act's purpose.[9] The federal government, through the Secretary of HUD, is authorized to make grants to participating cities to cover 80% of the cost of planning and developing such programs.[10] When a program has been formulated and approved by the locality, and is found to be in conformity with federal standards, the Secretary of HUD is authorized to make supplemental grants to assist the local agency established to administer the comprehensive programs.[11] The Act emphasizes local initiative and widespread citizen participation at every stage of the program.[12]

In November 1967, HUD approved New York City's application to participate in the Model Cities program and advanced $283,650 as a one-year planning grant for three neighborhoods, including Harlem-East Harlem. In June 1969, HUD approved the City's Comprehensive City Demonstration Program and entered into a grant agreement which provided the City with $65 million for the first year for the three designated neighborhoods, $12,033,071 of which was set aside for the Harlem-East Harlem Model Cities Neighborhood. In the City's Second Year Program, approved on April 7, 1971, $12,033,000 was reserved for Harlem-East Harlem. The City's Third Year Program was approved and $14,500,000 was reserved for Harlem-East Harlem. The only Model Cities funds which have been specifically used in connection with the Milbank-Frawley urban renewal project was a loan of $200,000 to the Milbank-Frawley Circle Housing Development Fund Co., Inc. to commence rehabilitation of several buildings on sites 5, 11, 18, referred to hereafter.[13]

## THE HOUSING ACT

The Housing Act of 1949 expressed the national policy of "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family."[14] Congress, from time to time, has sought by various governmental aids to achieve that objective. Urban renewal is one such method and seeks to deal with the problems of slums and urban blight and to create better communities by the planned rehabilitation or redevelopment of deteriorated or deteriorating areas, both residential and nonresidential.[15] It is locally conceived, planned and carried out and involves cooperation among local

---

8. *Id.* § 3301.

9. *Id.* §§ 3302, 3303.

10. *Id.* § 3304(a).

11. *Id.* § 3305.

12. *See* Coalition for United Community Action v. Romney, 316 F.Supp. 742, 748 (N. D.Ill.1970).

13. *See* note 61 *infra.*

14. 42 U.S.C. § 1441.

15. *See id.* § 1451(c). *See generally id.* §§ 1441–1490d.

and state governments, private enterprise, citizen groups and the federal government. An urban renewal program may involve acquisition and clearance of a slum or blighted area, disposition of the land for redevelopment in accordance with planned uses, or rehabilitation of substandard structures by either the local public agency or property owners, accompanied by provision for necessary public improvement; it may involve a combination of such activities. Local public agencies, authorized by state law to undertake urban renewal and receive federal assistance are eligible for renewal assistance. Urban renewal is financed by an arrangement between the local agency and the federal government acting through HUD and involves local contributions, federal advances and loans, and ultimately a federal capital grant, usually two-thirds of the net project cost. To obtain such federal assistance, the locality must initially survey its needs and provide documentation as to its eligibility for urban renewal assistance. Upon the submission of a Survey and Planning Application, the Secretary of HUD may advance funds to the local public agency[16]—in the case of New York City the Housing and Development Administration ("HDA") —for additional and intensive surveys to determine the feasibility of urban renewal and for the formulation of surveys and plans for specific projects.[17] The period between approval of the Survey and Planning Application and approval of the ultimate Loan and Grant contract is referred to as the planning stage. During this planning stage, spec-

ified activities such as land acquisition and related activities of site clearance and tenant relocation may be carried out even before a Loan and Grant contract is approved if a "Letter of Consent" is issued by HUD to the local agency. Such a letter is not a commitment by the federal government that the expenditures for such activities will be included in gross project cost, nor is it a commitment that the federal government will enter into a loan and grant contract to provide the funds for the execution of the project. It does constitute a determination that the expenditures for such activities will not be ineligible for eventual reimbursement solely because they were incurred before HUD had entered into a contract with the agency. HUD regulations specify the Letter is only to be used "where absolutely necessary" and upon a demonstration of the necessity for undertaking such activities during the project planning stage.[18] During this planning stage, the Urban Renewal Plan is formulated, and if approved by HUD and the local public agency,[19] becomes the basis for the contract of Loan and Grant between HUD and the local agency pursuant to which federal funding is provided. The Housing Act specifies the requirements of such a contract including a feasible method for the adequate relocation of individuals and families displaced from the urban renewal area.

In the summer of 1967, HUD granted the City's application for a Survey and Planning Advance and thereafter advanced $945,000 to examine the feasibility of the proposed urban renewal project in the Milbank-Frawley area.[20] On Sep-

16. Such advances must be repaid with interest out of funds which may become available for the project. Should no funds become available, then all unexpended funds from the advance must be returned and all equipment purchased for the project sold and the proceeds returned to the federal government. To the extent that any advance is unrepaid, the federal government takes the loss.

17. 42 U.S.C. § 1452(d).

18. Urban Renewal Handbook, CD 7227.1, chap. 1, ¶ 6 (July 1971). Previously

the regulation specified that such a letter was to "be issued only under compelling circumstances . . . ." Urban Renewal Handbook, RHM 7227.1, chap. 1, ¶ 5 (Feb. 1971).

19. Approval of the local governing body is also required—in this instance, the Board of Estimate of the City of New York.

20. During this stage, the City Planning Commission held a public hearing, determined that the area was substandard and unsanitary, recommended urban renewal

tember 21, 1967, the Board of Estimate approved the urban renewal plan, authorized condemnation in several stages and approved the filing of applications for a "Letter of Consent" and a contract for loan and grant under Title I of the Housing Act of 1949.

HUD issued the City a Letter of Consent on July 18, 1969 and an amended Letter of Consent on March 17, 1970, under which permission was thereafter granted to undertake condemnation of the twenty "early action" sites which the City acquired in August, 1970. The City then began to encounter increasing difficulty in formulating a workable relocation plan. On February 11, 1971, HUD, after a review of all federal housing programs within New York City, and not based on a review of any particular project, placed an embargo on all future acquisitions of real property by the City which might involve residential relocation; and, within Milbank-Frawley, no additional properties have been acquired. On June 29, 1971, HUD returned the City's application for a contract for Loan and Grant as unaccepted, stating: "The application fails to demonstrate that a feasible relocation program can be carried out for the project." HUD requested additional information, suggested revisions of the relocation plan to satisfy HUD requirements, and the City contemplates resubmission of the application. To date no contract for Loan and Grant has been entered into with the City and there is no assurance of federal funding of the Milbank-Frawley project.

It is against this backdrop of the City's efforts at urban renewal and its difficulties in providing adequate relocation resources that the present suit is set.[21] Based upon a survey of the relocation needs of the Milbank-Frawley Urban Renewal Area a relocation plan was formulated for the area coupled with a city-wide relocation plan. Plaintiffs allege it was formulated in cooperation with the Milbank-Frawley Circle Housing Council, Inc., a designated community organization, purporting to represent the local residents, and then under contract with the City.[22] Approved by the City in November 1968, the relocation plan provided for a staged method of rehabilitating structurally sound buildings and for building on existing vacant land first, so that needed relocation facilities would be created *prior* to the need for any relocation. Plaintiffs allege that instead of proceeding with that staged plan, the City began eviction proceedings in the state courts on March 16, 1971, in order to obtain possession of site 23, the early action site on which all the plaintiffs resided.[23] In response to the eviction proceeding, plaintiffs commenced this suit on April 7, 1971, and soon thereafter moved for extensive preliminary injunctive relief which sought

---

for the area, and certified a plan for the area in conformity with the general plan for the locality as a whole.

21. *See* Feliciano v. Romney, 336 F.Supp. 1340, 1342 (S.D.N.Y.1971).

22. Since April 1968, this organization has had four successive annual contracts with the City's Housing and Development Administration (HDA), which funds most of its activities. A controversy has developed between the "Council" and HDA as to the "Council's" compliance with the terms of the contracts as a result of which certain vouchers presented by the "Council" have not been processed nor paid. The parties are in agreement that matters pertaining to this controversy are not germane to the resolution of the current motions.

23. The City sought to obtain possession of site 23 then, rather than waiting for the completion of other stages of the renewal program, because it considered such timing essential to the construction of Frawley Plaza—with its 600 units of critically needed housing. The New York State Urban Development Corporation (UDC) had the funds and permits necessary to begin immediate construction; it needed only the land. Any delay beyond June 1, 1971 would have allowed the prospective contractor to renegotiate his contract, risking an escalation in project cost beyond the limits set by HUD regulations for projects eligible for subsidization under § 236 of the National Housing Act. 12 U.S.C. § 1715z—1. In short, there was a real danger that delay would cause

to enjoin their eviction and, among other matters, to enjoin all further attempts with respect to acquisition, site clearance and relocation efforts in the renewal area until a definitive plan for relocation or rehabilitation acceptable to them was produced; also to enjoin the City from relocating them except in compliance with the previously approved community development plan. The City indicated it would only seek to evict immediately the remaining tenants on the westerly portion of site 23, and the preliminary injunction was denied on May 5, 1971.[24] In denying the motion, Judge Tenney relied in part on the lack of any federal commitment to the City pursuant to a contract for Loan and Grant. "That the [relocation] plan which may be approved by HUD may be violative of federal statutory or regulatory requirements is obviously too speculative a basis upon which presently to issue an injunction."[25] The court further found that the balance of hardship weighed against granting the injunction; since the displaced residents were to be relocated in satisfactory temporary facilities, granting the injunction would imperil the construction of 600 desperately needed apartments.[26] Shortly after this decision, the residents were displaced from the westerly portion of site 23.

On August 23, the City commenced a proceeding in the state court for a writ of assistance to remove the remaining tenants from the easterly portion of site 23. Plaintiffs again sought preliminary injunctive relief; again it was denied. Upon resumption of the state court proceeding, the remaining tenants were ordered to vacate site 23 by January 17, 1972. Though plaintiffs filed a notice of appeal from the order denying their second motion for preliminary injunctive

relief, they have not prosecuted that appeal but rather moved for a trial preference and for assignment of the case to a single judge.[27] Shortly after assignment of the case to this court, defendants brought on the present motion to dismiss and deny class action status. Against this background of the objectives of the two major federal programs, contrasted with events in achieving those objectives, the complaint seeks federal relief.

I

## THE COMPLAINT

As noted at the outset, plaintiffs in essence charge that the federal, state and city governments have failed in their obligations in the Milbank-Frawley area with respect to relocation, rehabilitation, site maintenance, jobs and job training, and in their relation to a community organization.

Plaintiffs' voluminous thirty-page complaint, at times discursive, contains a series of broader based charges. These include denial of their rights under the relocation standards required by the Housing Act of 1949,[28] by Title II of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970,[29] and also required as part of any comprehensive program eligible for assistance under a Model Cities Program.[30] They charge that while there was a workable relocation plan, the city and state defendants have violated that plan by submitting false statistics to the federal defendants, and by staging construction which destroys the feasibility of the plan. It is claimed that rather than relocation in accordance with federally mandated standards, displaced residents have been offered no re-

---

the project to be aborted. *See* Feliciano v. Romney, 336 F.Supp. 1340, 1345 (S.D. N.Y.1971).

24. *See* Feliciano v. Romney, 336 F.Supp. 1340 (S.D.N.Y.1971).

25. *Id.* at 1344.

26. *Id.* at 1346.

27. This was prior to the Individual Assignment System.

28. 42 U.S.C. § 1455(c).

29. *Id.* §§ 4621–4638.

30. *Id.* §§ 3303(a)(4), 3307(a).

location resources at all, or only sub-standard housing, and that the City by various improper and harassing means has attempted to cause residents either to move out of the area or to accept inadequate housing. Acceptance by the federal government of the assurances given by the city defendants as a basis for initial and continued federal funding is alleged to be arbitrary and capricious.

Similarly, plaintiffs claim a denial of their rights under federal civil rights statutes [31] and the equal protection and due process clauses of the Constitution in that the defendants have forced Black and Puerto Rican residents into a housing market already plagued by an extremely low vacancy rate and that they have failed to provide any significant rehabilitation to compensate for the planned displacement. In short, in the context of alleged city-wide practices of racial discrimination and discrimination against indigent and welfare recipients, the charge is that city defendants have contributed to a shrinkage in the supply of decent, safe, standard and sanitary housing available to all residents and especially to Black and Puerto Rican residents of low income.[32]

With respect to rehabilitation, the complaint charges that the City has failed to follow the plan which it had originally approved providing for the rehabilitation of structurally sound buildings in the area, thereby violating the requirement of a feasible relocation plan under a loan or capital grant contract under the Housing Act,[33] and also thereby violating the eligibility for assistance provision mandated under a comprehensive city demonstration program required by the Model Cities Act.[34]

The further charge is made that the City owns and maintains buildings which "are in sub-standard condition, uninhabitable, and . . . a peril to the life, health and safety of the occupants and their neighbors," [35] which it is alleged is inconsistent with the federal requirements under the Model Cities program which requires a substantial increase in the supply of standard housing of low and moderate cost.[36] The City's actions are also claimed to violate other provisions of the Housing Act.[37]

Plaintiffs also charge that while the original urban renewal plan called for the training and employment of neighborhood people in the construction and operation of the projects, they have been denied such opportunities in violation of their rights under the Housing and Urban Development Act of 1968[38] and Title VI of the Civil Rights Act of 1964.[39] Under section 1715z—1 of 12 U.S.C., there is a reservation of interest reduction funds for the Frawley Plaza project. The HUD Act of 1968 provides that in the administration of a program authorized to receive such a payment, the Secretary of HUD shall require "that to the greatest extent feasible opportunities for training and employment arising in connection with the planning, construction, rehabilitation, and operation of housing assisted under such programs be given to lower income persons residing in the area of such housing . . . ." [40] Title VI of the Civil Rights Act of 1964 proscribes discrimination on the grounds of race, color, or national origin in "any program or activity receiving Federal financial assistance." [41] Each federal department empowered to extend federal financial assistance is au-

31. Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d—4; *see* 42 U.S.C. § 1983.

32. *See* Complaint, ¶¶ 46, 48, 63.

33. 42 U.S.C. § 1455(c)(1), (2).

34. *See id.* § 3303; *see also* Complaint, ¶¶ 52–57, 65.

35. Complaint, ¶ 58.

36. *See* 42 U.S.C. § 3303(a)(3).

37. Complaint, ¶ 66; *see* 42 U.S.C. § 1451(c).

38. 12 U.S.C. § 1701u.

39. 42 U.S.C. §§ 2000d to 2000d—4.

40. 12 U.S.C. § 1701u(1).

41. 42 U.S.C. § 2000d.

thorized to effectuate this provision by the issuance of rules and regulations, compliance with which may be effected "by the termination of or refusal to grant or to continue assistance" under certain specified procedures, or "by any other means authorized by law . . . ."[42] HUD has promulgated such regulations.[43] In sum, plaintiffs seek redress for defendants' alleged violation of their right to employment opportunities required under the aforesaid statutes and for alleged violation of nondiscriminatory provisions thereof.

Finally, plaintiffs complain of a common scheme to "frustrate, defeat and hamper . . . Federally mandated community participation" by interfering with the Milbank-Frawley Circle Housing Council, Inc., in various ways such as refusing to process and pay vouchers and, more recently, unreasonably failing to renew the Council's contract.[44] In addition to an alleged violation of constitutional rights, plaintiffs charge that this constitutes a violation of the Housing Act's requirement that the urban renewal plan be approved by the locality[45] and the requirements of the Model Cities Act.[46]

Against the background of these alleged extensive claims, we finally turn to the present motion.

## II

### A. Lack of Federal Jurisdiction

■ The complaint asserts federal jurisdiction under 28 U.S.C., section 1331(a) (federal question jurisdiction), 28 U.S.C., section 1343(3) and (4) (civil rights jurisdiction), and 28 U.S.C., section 1361 (mandamus). Defendants contend that there is no federal question jurisdiction to consider the Housing Act claims in the absence of any contract of loan or grant between HUD and HDA.[47] The argument is that, with respect to those claims arising under the Housing Act, absent a contract thereunder, plaintiffs acquired no rights under the Housing Act and there could be no violations of its relocation requirements. However, as will presently appear, the issues raised under the Housing Act are at least not insubstantial, which is sufficient to avoid their dismissal on federal question jurisdictional grounds.[48] In any event, even if the Housing Act claims were dismissed on such grounds, jurisdiction would remain to consider the constitutional and other statutory claims.[48a]

---

42. *Id.* § 2000d—1.

43. *See* 24 C.F.R. §§ 1.1–.12 (1972).

44. *See* Complaint, ¶¶ 44, 73; *see also* note 22 *supra.*

45. *See* 42 U.S.C. § 1455(a).

46. *See id.* § 3303(a), (b)(1).

47. Defendants also contend that absent the requisite amount, the court is without jurisdiction. They contend that plaintiffs seek to vindicate only "property" rights rather than personal rights, and that "property" rights do not fall within 28 U.S.C. § 1343(3), which requires no jurisdictional amount. This view has now definitely been rejected. *See* Lynch v. Household Fin. Corp., 405 U.S. 538, 542, 92 S.Ct. 1113, 31 L.Ed. 2d 424 (1972); Hagans v. Wyman, 462 F.2d 928, 930 (2d Cir. 1972).

48. *Cf.* Almenares v. Wyman, 453 F.2d 1075, 1093 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972). Contrary to the defendants'

contention, Judge Tenney, in denying plaintiffs' first request for preliminary injunctive relief did not suggest that the court lacked jurisdiction to hear the Housing Act claims. Indeed, he suggested the court had jurisdiction to grant an injunction if the federal government delayed approval of a relocation plan while large numbers of tenants were displaced. *See* 336 F.Supp. at 1346.

48a. Since there is jurisdiction to hear the constitutional claims, there is also power to hear the federal statutory claims which are properly "pendent." Almenares v. Wyman, 453 F.2d 1075, 1083 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972); *see* Rosado v. Wyman, 397 U.S. 397, 402–404, 90 S. Ct. 1207, 25 L.Ed.2d 442 (1970). Both the constitutional and statutory claims arise from the urban renewal activities in the Milbank-Frawley area and ordinarily would be expected to be tried in one judicial proceeding. *Cf.* United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**B.** *Failure to State a Claim upon Which Relief can be Granted*

■ It is settled that a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[49] And this is particularly true with respect to . actions involving asserted civil rights violations.[50] We turn then to the question whether it appears to a certainty that plaintiffs are entitled to no relief.[51]

**1.** *Housing Act of 1949 Claims*

■ The Housing Act standards upon which plaintiffs rely explicitly apply only to "[c]ontracts for loans or capital grants . . . made . . . with a duly authorized local public agency . . . ."[52] For example, the contract for a loan or grant requires a feasible relocation plan[53] and the statute conditions further assistance upon satisfactory assurances by the local public agency prior to actual displacement of individuals and families that the federal standards for their relocation are available.[54]

By its terms, the Housing Act is violated only if HUD enters into a contract which fails to meet the standards set forth in the Act, or the contract is improperly implemented. Here, no contract for loan or grant has been entered into between HUD and HDA, precisely because HDA failed to present a feasible relocation program.

Absent a contract, plaintiffs' claims under the Housing Act are premature, since there is no basis upon which to assert any violation of its provisions. Although HUD still has under consideration the City's application for a grant contract, which thus far HUD has found unacceptable, it may eventuate that, absent an adequate relocation plan, or for other reasons, no contract will ever be signed. Or, it may be that a contract fully complying with statutory standards may be executed and implemented.[55] The alternatives are too speculative a basis upon which to hold that a claim has been stated.[56]

To accept the plaintiffs' contention that federal Housing Act standards ought to be applied before a contract for loan or grant is signed would yield the anomalous result that a totally local urban renewal effort may be subject to federal standards.[57] While federal funds

---

49. Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

50. Escalera v. New York City Housing Authority, 425 F.2d 853, 857 (2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970); Holmes v. New York City Housing Authority, 398 F.2d 262, 265 (2d Cir. 1968).

51. Affidavits have been submitted on this motion, and it may properly be considered as one for summary judgment. Fed.R. Civ.P. 12(b).

52. 42 U.S.C. § 1455.

53. *Id.* § 1455(c)(1).

54. *Id.* § 1455(c)(2).

55. That decision will be judicially reviewable at that time. In each of the cases reviewing performance under the Housing Act, a contract for loan or grant had already been signed. *See, e. g.*, M. M. Crockin Co. v. Portsmouth Redev. & Housing Authority, 437 F.2d 784 (4th Cir. 1971); Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970); Norwalk Core v. Norwalk Redev. Agency, 395 F.2d 920 (2d Cir. 1968); Talbot v. Romney, 321 F.Supp. 458 (S.D.N.Y.1970); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968), vacated, 320 F.Supp. 308 (N.D.Cal.1969).
 In Arrington v. City of Fairfield, 414 F.2d 687 (5th Cir. 1969), there was no contract for loan or grant between HUD and the local agency, but the claim was upheld on constitutional grounds.

56. *See* 336 F.Supp. at 1344.

57. The Milbank-Frawley project did receive a planning grant from HUD in 1967, but plaintiffs do not complain that that grant was not made after due consideration of the appropriate factors. *See* 42 U.S.C. § 1451(a). Indeed the gravamen of plaintiffs' complaint is that a perfectly proper and acceptable plan formulated and approved in 1968 was subsequently violated by the City.

**668**

are now reserved for the Milbank-Frawley Circle urban renewal project, there is no federal commitment to allocate those funds. If no contract is executed, the program will remain locally funded or state-aided; and indeed several urban renewal projects in New York City are totally locally financed. The Housing Act suggests no legislative intent to control purely local urban renewal efforts. It does not contemplate the imposition of federal standards on local urban renewal; rather it seeks to assure that federally financed or aided projects comply with federal standards. Area residents are given the opportunity to be heard with respect to an urban renewal plan before the contract implementing it is signed, and major changes in the urban renewal plan require a new hearing.[58] Judicial review is available of the original decision to enter the contract and the local public agencies' efforts to effectuate it.[59] The Act focuses on the contract, assuring, among other matters, local residents a voice in its formulation and judicial review of its execution and implementation. Only upon execution of the contract is the federal government committed to the program, and a hitherto local effort then acquires a federal character and must meet the standards of federal law.

Plaintiffs, however, argue that even though HUD has not entered into a formal loan or grant contract with the City, nonetheless Housing Act standards apply because there has been extensive federal "involvement" in this area—specifically, the initial HUD advances for Survey and Planning,[60] the issuance of its Letter of Consent, substantial Model Cities appropriations, and an advance of seed money to another sponsored development in the area.[61] The question, however, is not whether federal involvement in the area has been substantial, but rather whether the federal standards which explicitly apply only to contracts for loan or grant should be applied in the absence of such contracts. Plainly, neither a Survey and Planning advance, nor a Letter of Consent, nor a Model Cities appropriation or advance of seed money is the functional equivalent of a contract for loan or grant; and such events, either singly or in combination, are insufficient to trigger Housing Act standards. Despite each of these actions, the implementation of the urban renewal project eventually may be financed in its entirety by the City,[62] or perhaps state-aided[63] if HUD decides that it will not enter into a loan or grant contract. The City assumes the risk that its sponsored project may never be federally approved and financed. As the Letter of Consent warned: "The granting of this consent is not a commitment that the Federal Government will actually provide capital grant funds for the carrying out of this project. No cost within the purview of this consent will be included in Gross Project Cost until an appropriate contract for capital grant has been executed."[64] And the

58. See 42 U.S.C. § 1455(d); Shannon v. HUD, 436 F.2d 809, 813–814 (3d Cir. 1970).

59. See M. M. Crockin Co. v. Portsmouth Redev. & Housing Authority, 437 F.2d 784, 789 (4th Cir. 1971); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968), vacated, 320 F.Supp. 308 (N.D.Cal.1969).

60. See 42 U.S.C. § 1452(d).

61. The only use of Model Cities funds was a loan of $200,000 in August 1970 to the Milbank-Frawley Circle Housing Development Fund Co., Inc. as seed money to commence rehabilitation of certain buildings on sites 5, 11 and 18, which was to

be repaid when the developer obtained its FHA financing. No part of the $200,000 was used for land acquisition, clearance or any other activity resulting in displacement.

62. See N.Y.Gen.Munic.Law §§ 501–25 (McKinney 1965), as amended, (McKinney Supp.1972).

63. See id.; N.Y.Pub.Housing Law §§ 70–76 (McKinney 1955), as amended, (McKinney Supp.1972).

64. Hence, issuance of the Letter of Consent is not "final" agency action subject to review but rather an interim determination which might become final agency action only upon the commitment of federal funds.

fact that a Model Cities area includes within it an urban renewal project to which plaintiffs seek to attach Housing Act standards is merely fortuitous; it in no way indicates that the urban renewal project itself will be federally funded.

■ Finally, plaintiffs argue that to deny them the benefits of the Housing Act merely because there is no contract for loan or grant between HUD and HDA constitutes invidious discrimination. The argument is that the line drawn by the statute is irrational since displacees are just as adversely affected by the decision to relocate them whether a contract for loan or grant is executed before or after their displacement, and indeed whether or not such a contract is ever executed. The plaintiffs contend that to deny them relocation relief simply because no contract for loan or grant has been executed, while affording assistance to those displaced after such a contract has been entered into, is to withhold relief on the basis of an irrational classification. But "[i]n the area of economics and social welfare," the Supreme Court recently stated, "a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' "[65] Again, in Jefferson v. Hackney, the Court instructed: "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them."[66]

Tying Housing Act standards to the execution of a contract for loan or grant represents a rational legislative judgment that federal funds should be available only to those localities meeting federal standards and that if a locality chooses to accomplish its urban renewal with solely local or otherwise available funds, it need not meet the requirements arising from the use of federal funds; it is, of course, required to comply with state and local standards. The provision tying federal standards to the contract affords the federal government the necessary time within which to evaluate and determine whether a locality's plan complies with federal standards and thereby is eligible for federal funds. Before a contract is executed, many factors, statutory, regulatory and otherwise, come into play until a determination can be made whether an urban renewal project will be federally funded. While it is easy to appreciate the pleas of site residents who seek the imposition of federal standards allegedly more exacting than local standards, they nevertheless remain a request for the imposition of federal standards upon projects which are and may continue to be locally financed urban renewal projects. In the absence of constitutional or statutory direction, that plea is properly addressed to appropriate legislative authorities.

In sum, plaintiffs have failed to state a claim upon which relief can be granted. There has been no final agency action subject to review and there can be no violation of the Act in the absence of a contract for loan or grant. Accordingly, all claims based upon the Housing Act are dismissed. This dismissal is, of course, without prejudice to the repleading of such claims when and if a contract for loan or grant between HUD and HDA is executed and it is alleged that there is a failure to comply with federal standards. Plaintiffs contend,

65. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

66. 406 U.S. 535, 546–547, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972); see gen-

erally San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S. Ct. 1278, 1300–1302, 36 L.Ed.2d 16 (1973).

however, that dismissal of their claims under the Housing Act does not foreclose their claims for alleged violations of statutory requirements under the Model Cities Act.

### 2. *Model Cities Act Claims*

■ The federal commitment under the Model Cities program in the Harlem-East Harlem area, which geographically encompasses the Milbank-Frawley project, is in a different posture from the proposed federal funding under the Housing Act. Under the Model Cities program, there has not only been a planning grant, but three annual grants totalling $38 million in order to implement the comprehensive city demonstration program in the Harlem-East Harlem neighborhood. Plaintiffs do not complain about the size of the federal program, but rather its implementation. They contend that those displaced in carrying out the Model Cities program have not been afforded the relocation to which they are entitled under the Act;[67] and, while the other allegations of the complaint with respect to violations of the Model Cities Act cannot be described as a model of precise pleading, plaintiffs appear to complain that the City has failed to comply with the comprehensive demonstration program and has contravened the purposes of the Model Cities Act. The complaint, with its discursive and overlapping allegations, pleads ten separate causes of action which generally are divided into three charges of violations of statutory provisions pertaining to (1) "relocation"; (2) "replacement of housing units"; and (3) "site maintenance." The Act requires that a Model Cities program contribute "to a well-balanced city with a substantial in-

crease in the supply of standard housing of low and moderate cost . . . ."[68] Plaintiffs charge that the program, as implemented in the Milbank-Frawley Circle area of the Harlem-East Harlem neighborhood, has reduced the total supply of housing and provided inadequate services to those living in publicly owned buildings. Indeed, it is charged that "the sub-standard conditions have developed or worsened after the City acquired title to the buildings, and have in fact developed as a result of City Defendant's improper and inadequate maintenance of those buildings."[69]

■ The Model Cities Act prescribes the conditions which a comprehensive program must meet to be eligible for assistance.[70] The courts may review agency action in implementing these standards in light of the complaints raised by residents, and indeed such final judicial review is necessary if the statutory standards are to be enforced and the Act's requirement of "widespread citizen participation" is to be effectuated. The Model Cities Act contains no provision which would preclude judicial review, nor are actions under the Act committed to agency discretion by law.[71] Consequently, just as with HUD's initial determination to approve the program,[72] and the decisions by the locality and HUD relating to citizen participation,[73] HUD's decision to continue to participate in a program which is alleged to violate the statutory mandate and to depart from the originally approved program should also be subject to judicial review.

The defendants, however, contend that the Model Cities Act is inapplicable since the proposed Milbank-Frawley

---

67. *See* 42 U.S.C. § 3307(a).

68. *Id.* § 3303(a)(3).

69. Complaint, ¶ 61.

70. *See* 42 U.S.C. § 3303.

71. *See* North City Area-Wide Council, Inc. v. Romney, 428 F.2d 754, 757 (3d Cir. 1970); Coalition for United Community

Action v. Romney, 316 F.Supp. 742, 746 (N.D.Ill.1970); 5 U.S.C. §§ 701, 704.

72. *See* Coalition for United Community Action v. Romney, 316 F.Supp. 742 (N.D. Ill.1970).

73. *See* North City Area-Wide Council, Inc. v. Romney, 428 F.2d 754 (3d Cir. 1970).

project on site 23 is not alleged to be, and in fact is not, part of a "comprehensive city demonstration program" as defined in that Act. Accordingly, they urge dismissal of all claims based upon the Model Cities Act since plaintiffs' allegations concerning (1) relocation, (2) replacement, and (3) site maintenance are all urban renewal standards arising under the proposal to make Milbank-Frawley a federally aided urban renewal project which thus far has not been consummated and may never be; that the mere coincidence that Milbank-Frawley happens to be located within the Harlem-East Harlem Model Cities area does not eliminate the fact that the relocation, replacement and site maintenance activities, or lack of activities, of which plaintiffs complain are conducted by the city without benefit of federal funds. They stress that Model Cities funds have not been used in this area in any activity relevant to the allegations in the complaint with the exception of the $200,000 loan for seed money with respect to three "early-action" sites in connection with their rehabilitation. While the use of those funds may itself constitute the basis for a claim of inadequate relocation for any displaced by such rehabilitation, plaintiffs contend that the use of Model Cities funds in the area has been far more extensive. One affidavit alleges that over $4 million is being expended on a construction subsidy and, while this applies to the entire Harlem-East Harlem neighborhood, defendants do not counter the reasonable inference that some of these funds have trickled into the Milbank-Frawley Circle area. Further, the complaint alleges that clearance activities began in the Milbank-Frawley Circle area in 1968 under the direction of the HDA and the New York City Housing Authority, pursuant to a contract with the Model Cities Administration. The claim is disputed by the HDA administrator who maintains that no effort was made by the City to clear the area until August 1970, when the City acquired the twenty "early-action" sites. The dispute as to the extent to which Model Cities funds have been used in renewal activities which result in displacement presents a genuine issue of fact which must await a determination on the merits.

Even apart from the displacement effect of the Model Cities program, in view of plaintiffs' allegations of inadequate site maintenance, the shrinkage of adequate housing and interference with citizen participation, there remain questions as to whether the comprehensive program as presently implemented is in compliance with federal requirements that such a program "provide . . . widespread citizen participation," and "contribute to a well-balanced city with a substantial increase in the supply of standard housing of low and moderate cost . . . . "[74] Such questions must also await a determination on the merits.

### 3. *Uniform Relocation Act of 1970 Claims*

In their reply to the present motion, plaintiffs claimed that they were entitled to the federal relocation standards of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Uniform Act").[75] The Act "establish[es] a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole."[76] It provides that when "the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971,"[77] displaced persons are to be offered specified assistance including relocation standards

---

74. 42 U.S.C. § 3303(a)(2), (3).

75. 42 U.S.C. §§ 4601–4655.

76. *Id.* § 4621.

77. *Id.* § 4625.

which, as defined, are equivalent to those required under section 105(c) of the Housing Act,[78] and section 107(a) of the Model Cities Act.[79]

Plaintiffs argue that the Uniform Act entitles those displaced by the Milbank-Frawley Circle project to federal standards of relocation, despite the absence of a contract for loan or grant. But section 4625 of Title 42, upon which plaintiffs rely, explicitly applies only when displacement has resulted from the acquisition of land for a program or project undertaken by a federal agency. Prior to the contract for loan or grant, the project is not undertaken by the Federal Government.[80] Any displacements occurring in connection with the Milbank-Frawley Circle urban renewal project are caused by locally financed programs which the Uniform Act does not purport to reach. As with the Housing Act, the thrust of the Uniform Act is toward relocation effected under federal programs; before the contract for loan or grant is executed, the determination of the federal nature of the program or federal assistance cannot be made.

### 4. HUD Act of 1968; Title VI of the Civil Rights Act of 1964 Claims

■ Relying upon these acts, plaintiffs seek redress from alleged discrimination in the training and employment of neighborhood people. The argument is that in a program authorized to receive a section 236 [81] interest reduction payment—and it will be recalled that there is a reservation of such funds for Frawley Plaza—training and employ-

ment must be given to lower income residents of the area,[82] and that this may be enforced by the federal fund cut-off provision of Title VI.[83]

■ It is doubtful that Title VI can be utilized to effectuate the employment guidelines which were grafted on to the section 236 interest reduction program by the HUD Act of 1968. The purpose of the interest reduction program remains to "reduce rentals for lower income families . . . ." [84] There is no indication that a prime purpose is to provide employment. Yet Title VI explicitly excludes from its coverage "any employment practice of any employer, employment agency, or labor organization *except where a primary objective* of the Federal financial assistance is to provide employment." [85] Since a section 236 program remains a rent reduction program, not an employment project, it follows that Title VI is not applicable.

Even *if* Title VI could be used to effectuate employment guidelines, its scheme is essentially administrative; federal agencies are authorized and directed to effectuate its procedures. Accordingly, HUD has established rigorous regulations to ensure that no person is denied on discriminatory grounds the benefits of a program receiving financial assistance from HUD and adopted appropriate procedures for gathering information, investigating complaints and enforcing compliance with the purposes of Title VI.[86] It is familiar teaching that those administrative remedies must be exhausted before plaintiffs can seek judicial redress.[87] All of those proce-

---

78. *Id.* § 1455(c).

79. *Id.* § 3307(a).

80. Although 42 U.S.C. § 4637 contemplates that persons like plaintiffs are displaced persons and therefore entitled to some benefits of the Uniform Act, the benefits of § 4625 appear to be limited to cases involving projects undertaken by the federal government.

81. 12 U.S.C. § 1715z—1.

82. *See id.* § 170lu.

83. 42 U.S.C. § 2000d—1.

84. 12 U.S.C. § 1715z—1(a).

85. 42 U.S.C. § 2000d—3 (emphasis added).

86. *See* 24 C.F.R. § 1.1–.12 (1972).

87. *See* North Philadelphia Community Bd. v. Temple Univ., 330 F.Supp. 1107, 1110–1111 (E.D.Pa.1971); Powelton Civic Home Owners Ass'n v. HUD, 284 F.Supp. 809 (E.D.Pa.1968).

dures were open to the plaintiffs, but there is no indication they were utilized.. All remain available; plaintiffs should be required to utilize them and these claims must be dismissed.

### 5. *Equal Protection and Due Process Claims*

 Plaintiffs charge that the defendants, who knew or readily could have ascertained that relocation resources in New York City were virtually nonexistent, have destroyed housing units without replacing them, have displaced residents into a housing market already suffering from a steadily diminishing vacancy rate, and have harassed tenants by forcing them into substandard housing units and causing them to leave the area or city. They charge that "[b]ecause of the Citywide practices of racial discrimination and discrimination against the indigent and welfare recipients, [they] and those similarly situated are unable to find adequate housing to replace the housing" [88] which has been destroyed.

Norwalk Core v. Norwalk Redevelopment Agency,[89] involved an urban renewal project which was funded pursuant to a loan and capital grant contract between the local agency and HUD. In allegations similar to those here, the complaint charged that the city continued to demolish the homes of Blacks and Puerto Rican residents without providing for adequate relocation resources in view of crowded public housing and rampant discrimination against Blacks and Puerto Ricans in the private housing market. The charge was that the locality did not assure relocation for Black and Puerto Rican displacees to the same extent as for Whites and that it intended to drive many Blacks and Puerto Ricans out of the City. "Some of the displaced Negro and Puerto Rican families have been compelled to move into over-crowded housing, some into housing at rentals substantially in excess of their financial means, and some into housing outside the City." [90] The court held that "[w]here the relocation standard set by Congress is met for those who have access to any housing in the community which they can afford, but not for those who, by reason of their race, are denied free access to housing they can afford and must pay more for what they can get, the state action affirms the discrimination in the housing market. This is not 'equal protection of the laws.'" [91]

In Arrington v. City of Fairfield, the court found that "plaintiffs may be able to show that the City will knowingly and actively precipitate the dislocation of persons who, because of a city-wide practice of residential discrimination, will have no place to go. Exclusion by physical displacement resulting from public discrimination is no less objectionable than such exclusion by rezoning." [92]

 The teaching of both cases is that equal protection is denied when the state displaces residents into a housing market where, because of their race, they are deprived of adequate facilities and are consequently forced into substandard housing or out of the city entirely.

The defendants contend *Norwalk Core* and *Arrington* are distinguishable upon their facts, which they may well be. But plaintiffs here in substance make the same contention as advanced in those cases that the City has displaced them into a racially discriminatory housing market without providing adequate relocation. In attempting to blunt the force of both *Norwalk Core* and *Arrington,* the defendants argue that plaintiffs here have not attempted to show and could not show that Blacks and Puerto Ricans are less adequately relocated than

88. Complaint, ¶ 63.

89. 395 F.2d 920 (2d Cir. 1968).

90. *Id.* at 925.

91. *Id.* at 931.

92. 414 F.2d 687, 692 (5th Cir. 1969).

Whites, or that the relocation program undertaken by the City was intended to drive members of the alleged class out of the City or provide them with substandard housing; and finally, they point to the fact that the percentage of Black and Puerto Rican citizens has increased in the past decade. While these contentions present powerful counterarguments to plaintiffs' charges, the court on this motion does not pass upon their verity. Whether or not they can be sustained is another matter. However, the contentions are made by plaintiffs and they present genuine issues of fact. Plaintiffs present affidavits and statements from displaced residents attesting to conditions in the tenements to which they have been relocated, allegedly worse than those previously occupied, and also there is the fact that while the City has eliminated substandard housing in the area, apparently at the time the affidavits were filed the only replacement is the 600 units in Milbank-Frawley, scheduled for tenancy in the Fall of 1973. The City contends that this project when completed will result in more units than those destroyed, with first preference to former site displacees; that it is proceeding with rehabilitation of other sites and has evinced a readiness to proceed with the development of other adequate and increased relocation resources. The arguments and counterarguments simply emphasize that plaintiffs' contention of discriminatory conduct allegedly resulting in violation of the Equal Protection Clause forecloses disposition by way of summary judgment. They present genuine issues of fact.

### C. *Primary Jurisdiction*

The defendants argue that, under the doctrine of primary jurisdiction, the claims under the Housing Act and the Model Cities Act should be dismissed or at least stayed pending their submission to and determination of them by HUD. The issues raised by plaintiffs, they argue, are within the special competence of HUD and initially should be sifted and determined by that agency.

There is "no fixed formula" for the invocation of the doctrine of primary jurisdiction [92a] and it cannot be stated " 'in the form of a rule in terms either of its analytic structure or of its incidence.' "[93] In the classic definition of primary jurisdiction, the Supreme Court has described it as:

> "[A] principle, now firmly established that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."[94]

In short, the doctrine is a flexible one and the decision whether to apply it depends upon a case by case determination of whether, in view of the purposes of the statute involved and the relevance of administrative expertise to the issue at hand, a court ought to defer initially to the administrative agency.[95]

**92a.** United States v. Western Pac. R. R., 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

**93.** Jaffe, Primary Jurisdiction, 77 Harv. L.Rev. 1037 (1964), quoted in World Airways, Inc. v. Northeast Airlines, Inc., 349 F.2d 1007, 1010 n. 9 (1st Cir. 1965),

cert. denied, 382 U.S. 984, 86 S.Ct. 561, 15 L.Ed.2d 473 (1966).

**94.** Far East Conference v. United States, 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952).

**95.** *See* United States v. Western Pac. R. R., 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.

The Model Cities Act places primary reliance upon HUD's expertise in formulating and implementing a practical comprehensive city demonstration program with the concerned locality. The courts are not equipped, either in experience or personnel, to sift the mass of data or make the expert determinations needed to pass upon and administer the vast urban renewal efforts or the even more comprehensive city demonstration programs under the Model Cities Act. Courts are limited to reviewing the efforts of HUD in carrying out its statutory responsibilities. While not specifically referring to the Model Cities Act, our Court of Appeals has warned: "Familiar doctrines limit the occasions on which particular judicial remedies, if any, are appropriate. In determining whether there has been compliance . . ., courts will evaluate agency efforts and success . . . with a realistic awareness of the problems facing urban renewal programs." [96] And another court, in dissolving a previously entered preliminary injunction issued a similar warning against "[substituting] the judgment of a court for that of the responsible and presumably more expert administrators and [involving] the judiciary in the complexities of urban renewal—a task for which the judiciary is neither intended nor equipped and an involvement which would in the long run do more harm than good." [97] Moreover, were the federal courts, already heavily overburdened by the demands of new and burgeoning areas of litigation, called upon the review the minutiae of detail of urban renewal and supplementary programs in order to make a proper determination of whether they were in compliance with the statutory requirements of demolition, rehabilitation and relocation, to mention but several items, without the benefit of prior analysis and evaluation by the agencies entrusted with that responsibility, it might well inundate the courts and impair their efficiency.

The plaintiffs have ample means to present their views to HUD with respect to their claims of inadequate relocation, rehabilitation and site maintenance. The Model Cities Act depends on widespread community participation in formulating and carrying out the program. Within that framework, HUD is required to provide the means for local residents to present their views when the original plan is drafted and if there is any serious modification of the original plan.[98] It is quite possible that after the plaintiffs have made their views known to HUD, the continued implementation of the comprehensive city demonstration program may be acceptable to both the plaintiffs and other interested citizen participants, as well as being in compliance with federal standards, thus obviating the need for further judicial review.

The plaintiffs argue that primary jurisdiction ought not to be applied because this case involves essentially a question of law which the court is as capable as the agency of determining and which involves no administrative expertise.[99] But essential facts crucial to the existence of any claim are disputed—whether the displacees have been provided with adequate or inadequate relocation, whether the buildings acquired by the City are properly main-

Ed.2d 126 (1956); Catholic Medical Center v. Rockefeller, 305 F.Supp. 1256, 1266–1267 (E.D.N.Y.1969) (subsequent history omitted;) *cf.* United States v. Yale Transp. Corp., 184 F.Supp. 42, 48 (S.D.N.Y.1960).

96. Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2d Cir. 1968).

97. Western Addition Community Organization v. Romney, 320 F.Supp. 308, 312–313 (N.D.Cal.1969).

98. *See* North City Area-Wide Council, Inc. v. Romney, 428 F.2d 754, 757–758 (3d Cir. 1970); *cf.* Coalition for United Community Action v. Romney, 316 F. Supp. 742, 748 (N.D.Ill.1970).

99. *See* Ratner v. Chemical Bank N. Y. Trust Co., 309 F.Supp. 983, 986 (S.D. N.Y.1969); *see also* Rosado v. Wyman, 397 U.S. 397, 405–407, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

tained, whether the defendants by harassing tenants have attempted to drive them into substandard housing or out of the City entirely.

It is true that there are claims in the present complaint, such as the alleged violations of the equal protection guarantee, which cannot be disposed of by HUD. Nevertheless, the facts developed by HUD, such as the quality and extent of the relocation provided for area residents, will be of substantial assistance to the court in deciding the constitutional claims. The Supreme Court has recently made it clear that in such circumstances the court ought to defer initially to the agency. In *Ricci v. Chicago Mercantile Exchange*,[100] the petitioner filed an antitrust complaint charging that the respondents had conspired to restrain his business in violation of the rules of the Chicago Mercantile Exchange and the Commodity Exchange Act. Although the Supreme Court conceded that the Commission had no authority to determine either whether the regulatory scheme had conferred antitrust immunity on the alleged antitrust activities, or whether any rule of the Exchange takes precedence over antitrust policies, the Court affirmed the Court of Appeals' judgment that the antitrust suit should be stayed pending determination by the Commission whether or not the rules of the Exchange had been violated. "Either judgment would require determination of facts and the interpretation and application of the Act and Exchange rules. And either determination will be of great help to the antitrust court in arriving at the essential accommodation between the antitrust and the regulatory regime . . .."[101]

The question remains whether this suit should be dismissed,[102] or simply stayed pending administrative determination of these grievances.[103] Since under primary jurisdiction doctrine a court's jurisdiction is not ousted, but only postponed, the decision is discretionary. The advantage in dismissing the action would be that, upon administrative review, the plaintiffs may be sufficiently satisfied with the results that no new action will be brought, or if a new suit is instituted, the new complaint will be tailored to the standards explained in this decision and to the altered circumstances following the administrative determination. On the other hand, there is a far stronger argument for retaining jurisdiction and only staying the action, not only to avoid duplication of the extensive proceedings thus far, but also because the area residents are entitled to know that the federal courts are concerned with their plainly pressing problems and that any temporary inaction is due to postponement and not abdication. Consequently, those claims which have not been dismissed for failure to state a claim are stayed pending submission of the Model Cities Act claims to and determination of them by HUD.[104]

## III

D. *Class Action Determination*

Defendants seek a determination that this action may not properly be maintained as a class action. However, it would be inappropriate to make such a determination at this time since events after the commencement of the action have seriously undermined the ability of

100. 409 U.S. 289, 93 S.Ct. 573, 24 L.Ed. 2d 525 (1973).

101. *Id.* at 307, 93 S.Ct. 573 at 583.

102. *See, e. g.,* Far East Conference v. United States, 342 U.S. 570, 576–577, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

103. *See, e. g.,* United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); General

Am. Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 432–433, 60 S.Ct. 325, 84 L.Ed. 361 (1940).

104. While those claims under the Housing Act must be dismissed because of the absence of any contract for loan or grant, the determination of the primary jurisdiction issue with respect to the Model Cities Act claims would be equally applicable to the Housing Act claims.

the named plaintiffs "fairly and adequately" to protect the interests of the class.[105]

When this action was instituted, all ten plaintiffs and their families faced eviction from site 23; time passed, preliminary injunctions were denied, and in time all plaintiffs were relocated. Nine of their families have been relocated in public housing accommodations within the immediate neighborhood of their former homes. The tenth family purchased and moved into its own home in the Spring of 1972. In sum, site 23 has been completely vacated and cleared of all tenancies and improvements with construction underway and, as already noted, scheduled for completion by the end of 1973.

It is axiomatic that to bring a class suit its representative must be a member of that class,[106] and former class members are not adequate representatives.[107] There is no indication that any of the named plaintiffs are now subject to relocation from either a Model Cities or Housing Act program or suffer from inadequate site maintenance or discrimination in training and employment. Consequently, the defendants' motion to deny class action status to plaintiffs is granted on the grounds of inadequacy of representation, but without prejudice to an application for intervention within thirty (30) days by any qualified person asserting claims identical to those advanced by the original plaintiffs herein.

Submit order in accordance with the foregoing.

---

105. Fed.R.Civ.P. 23(a)(4).

106. Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.C. 549, 7 L.Ed.2d 512 (1962) (per curiam); 7 C. Wright & A. Miller, Federal Practice and Procedure § 1761 (1972).

---

107. Norman v. Connecticut State Bd. of Parole, 458 F.2d 497 (2d Cir. 1972) (per curiam); Carroll v. Associated Musicians, 316 F.2d 574 (2d Cir. 1963); Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A., 55 F.R.D. 26, 29 (S.D. N.Y.1972).